J. C. KROENER, Appellee, v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

1. **Master and Servant:** DEFECTIVE APPLIANCES: INJURY TO EMPLOYEE: CONTRIBUTORY NEGLIGENCE: EVIDENCE. The plaintiff, a brakeman in the employ of the defendant, while on his way, in the nighttime, to couple a moving train of five cars to a car standing on a side track some distance beyond him, and when within twenty or twenty-five feet of the switch near which the coupling was to be made, stepped onto the track in front of, and with his back to, the moving train, and his foot becoming lodged between a guard rail and a lead rail at a switch, he was run over by said train and his foot cut off. It appeared from the evidence that the plaintiff at the time was walking rapidly, and that the train was moving at not to exceed one-half that speed. The surface between the tracks and at the side was level and cindered. The plaintiff was familiar with switching at way stations along the line of the defendant's road, was acquainted with the relative situation of the switches, frogs and guard rails at the place of the accident, and testified that he carried a lantern, and that if one was careful and looked where he was going, he could see when he came to a frog, switch or guard rail. There was evidence from which the jury might have found that the plaintiff's foot was caught because of the blocking between the guard and main rails being defective, and that the plaintiff had no knowledge of such defect, nor reason to apprehend it. *Held,* that it could not be said as a matter of law that the plaintiff was guilty of contributory negligence.

2. ———: ———: ———: EXCESSIVE VERDICT. At the time of the accident the plaintiff was twenty years of age, was earning sixty dollars a month, and had, under the evidence, an expectancy of a little more than forty-two years. *Held,* that a verdict for twelve thousand dollars was excessive.

*Appeal from Tama District Court.*—Hon. L. G. Kinne, Judge.

### Friday, May, 12, 1893.

Action for personal injury. There was a judgment for plaintiff, and the defendant appeals.—*Reversed.*

*Mills & Keeler,* for appellant.

*Struble & Stiger,* for appellee.

Granger, J.—The plaintiff was a brakeman in the employ of the defendant company. On the twentieth day of May, 1890, and for some time before, his work was on a freight car. On that day he ran into the station of Van Horn about noon, and in the evening he was set at work in the yard with a switching crew, which, besides the engineer and fireman, consisted of three men. It was the duty of one to pull the pins to cut the train or detach the cars to be shoved or "kicked" by the engine onto a track, as desired; another was to "throw the switches;" and the third, which was the plaintiff on the night in question, acted as "car catcher," that is, when cars were shoved in onto a track, and were moving, detached from the engine, it was the duty of the car catcher to climb onto and stop them, or regulate their speed, when necessary. The duties of the "car catcher" and "pin puller" were to some extent interchangeable, as the situation of the work seemed to require. In the yard at Van Horn was a lead track, running east and west, from which branched several side tracks, and at the junction of each with the lead track was a switch. The switches were numbered consecutively from west to east, and the side track bore the number corresponding with its switch. Some cars had been cut off, and

sent in onto track number 7, and the plaintiff "rode" them to their place. In the meantime the remainder of the crew had cut off five more cars from the train, and "kicked" them back onto the lead track, intending them to be coupled to a car that was standing on track number 5, but not so as to clear the lead track. The plaintiff passed over from track number 7, where he had left the cars before mentioned, to the lead track, on which the five cars were moving to the west. The others of the crew, after detaching and sending the cars onto the lead track, went east to do other switching. The speed of these cars on the lead track was slow, and the plaintiff did not attempt to "ride" them, but walked in advance of them towards the car at switch number 5 to make the coupling when the cars should reach it. On his way he stepped onto the lead track, and it is a theory of the case that his foot became fast between a lead rail and a guard rail, and the moving cars cut off his foot. It is for damage occasioned thereby that this action is brought.

I. The assignment of error mainly relied upon by the appellant is that involving contributory negligence on the part of the plaintiff. It is urged that the testimony of the plaintiff shows affirmatively such negligence. The night of the accident was somewhat stormy, and it occurred somewhere from 10 to 11 o'clock. It is undisputed that, before reaching the car where the coupling was to be made, there was no necessity for the plaintiff to step onto the track on which the cars were moving, as beside the track, all the way to switch number 5, some eighty or ninety feet, the walk was surfaced with cinders, hard and level. The plaintiff had a lantern,. and by attention could see the condition of the walking both between and outside of the rails. It is clearly a case in which,

1. Master and servant: defective appliances: injury to employee: contributory negligence: evidence.

with the thought of danger from stepping on the track in mind, the accident could have been avoided.

The appellant, in its contention, for an affirmative showing of negligence on the part of the plaintiff, treats the case as if the facts were that he was walking along the track in front of moving cars, not to exceed two car lengths behind him, when his foot was caught between the guard and main rail, and he was injured.  A number of authorities are cited in support of a rule that it is negligence for an employee to walk on the track in front of a moving train, in the discharge of a duty, when the duty can be as well performed by walking where it is safe; and the argument is in support of that, and quite similar rules, as applicable to this case. In this connection, let us look definitely to the particular act of the plaintiff resulting in the injury.  From twenty to twenty-five feet east of switch number 5 is the guard rail where the accident occurred.  To this point the plaintiff had been walking outside of the track, where it was safe.  The cars were moving slowly, not to exceed one and a half to two miles an hour, and about two car lengths behind him.  The general condition of the tracks and walks in the yard was good, as the plaintiff must, in his work in the yard that evening, have observed.  Aside from the movement of the cars, there was nothing to indicate danger from stepping or walking on the track.  The following is the plaintiff's testimony, immediately connected with the accident:

"*Question.*  When you were going west, as you arrived at the east end of the guard rail at switch number 5, what happened?  *Answer.*  Well I was walking along, and I got even with the guard rail, and I stepped in.  My foot got caught fast between the end of the guard rail and the main lead rail.

"*Question.*  This switch number 5, and all the switches, led off from what was known as the 'lead track?'  *Answer.*  Yes, sir.

"*Question.* When you arrived at the east end of the guard rail, you stepped your foot into the opening in the rail? *Answer.* Yes.

"*Question.* State whether or not your foot went in between the guard rail at the east of the main rail of the lead. *Answer.* Yes, sir.

"*Question.* State to what degree it was fastened there,—whether only very slightly, or very fast. *Answer.* Well, it was very fast in there, for I jerked a couple of times. I tried to get it out.

"*Question.* When you found your foot in that rail, and was very fast, what did you do? *Answer.* I made an outcry,—hallooed. Then I tried to jerk my foot out. I kind of jerked down, and I raised up. About the time I raised, the car hit me, and I went down.

"*Question.* How many times did you struggle to get out? *Answer.* Once or twice.

"*Question.* State what efforts you made, within your strength, to extricate yourself from the condition you found yourself in between those two rails. *Answer.* Well I tried to jerk it out; tried to get it out, and stooped down,—kind of.

"*Question.* State whether the cars came on you,— these two cars that were kicked to the west. *Answer.* Yes, sir.

"*Question.* State whether or not you had extricated your foot entirely at the time the cars struck you? *Answer.* I don't know as to whether I did or not. It got loose about the time. Whether the car knocked it out of there, or how it just got out, I don't know.

"*Question.* State whether you had been able to remove your feet or the leg from the rail before the car struck you? *Answer.* No, I don't think I had. I was knocked down.

"*Question.* State how your limb lay when you were knocked down, with reference to the rail,— whether it was on or off the rail? *Answer.* It must

have been knocked right with the rail. I crawled ahead of it,—tried to get outside of it,—and got ahead of it.

"*Question.* How far is the east line of that guard rail, proper, from switch number 5? *Answer.* About twenty or twenty-five feet."

It appears from the cross-examination that the plaintiff was quite familiar with switching at way stations along that and other lines of road; that he knew of the relative situations of the switches, frogs and guard rails, and of his approach to switch number 5. The following is from the cross-examination:

"*Question.* In switching at night, you always carry a lantern, do you? *Answer.* Yes, sir.

"*Question.* And, with the aid of that lantern, you are enabled to determine when you come to a frog and switch and guard rail? *Answer.* Yes, if a fellow happens to notice. What I mean is, if he is careful, and looks where he is going, the lantern enables him to see that.

"*Question.* Mr. Kroener, you say that you were switching there this night of the accident,—in the yards of Van Horn? *Answer.* Yes.

"*Question.* Now, this work of switching is doing about the same things about the cars and guards as you do when on the road; about the same when you come to switch across from one track to another. At the Van Horn yards, that night, you performed about the same movements that you do in switching your cars on your run? *Answer.* Yes.

"*Question.* You say, when those detached cars were coming down there, you started to walk down to where these standing cars were, in order to couple them? *Answer.* Yes, sir.

"*Question.* Then you started to walk west? *Answer.* Yes, sir.

"*Question.* As you stood there, I think you said

you thought you were a little outside of the north rail of the lead track? *Answer.* Yes, sir.

"*Question.* As you turned then to walk west, you were on the north side of the lead track? *Answer?* Yes, sir.

"*Question.* Did you walk down there, towards the west? *Answer.* Yes, sir.

"*Question.* How far outside of the north rail of the lead track were you when you were walking down? *Answer.* Well, I couldn't say. Probably two or three feet.

"*Question.* The ground all along there between switches 5 and 6 is level and hard cinders, isn't it? *Answer.* Yes, sir.

"*Question.* And surfaced up to the top of the ties,— well up? *Answer.* Yes, sir.

"*Question.* As you walked down, then, your back was towards these moving cars? *Answer.* Yes, sir.

"*Question.* They were going west, and you were just ahead of them, walking west yourself? *Answer.* Yes, sir.

"*Question.* For the purpose of coupling them when they came clear down to switch number 5? *Answer.* Yes, sir.

"*Question.* As you came down west for that purpose, did you step onto the lead track? *Answer.* Yes.

"*Question.* Tell the jury now, and point out from this photograph (Exhibit 1) about where it was that you stepped in between the rails of the lead track to walk down west. *Answer.* Well, I don't know whether I stepped right onto the guard rail, or whether it was a foot or two on the east side of it.

"*Question.* As you recollect it, then, you left the outside walk, and stepped into the track, either right at the guard rail, or a foot or so east of it? *Answer.* Yes, sir.

"*Question.* In other words, you left the outside

walk, and stepped on the track just in front of the guard rail? *Answer.* Yes, sir.

"*Question.* Just ahead of the cars? *Answer.* Yes, sir.

"*Question.* At the time you say you struck your foot, were you partially over the north rail of the lead track, or wholly over? *Answer.* I was only partially over.

"*Question.* You were turning out from the path along the north side of the track in onto the track? *Answer.* Yes, sir.

"*Question.* In turning out at the moment you were caught, you think your right foot was outside—north —of the rail? *Answer.* Yes, sir.

"*Question.* And your left foot was south of the north rail? *Answer.* Yes, sir.

"*Question.* In other words, you were straddling the track? *Answer.* Yes, sir."

Are we, in view of the facts thus presented, to say that, as a matter of law, there was contributory negligence? The plaintiff says that at the time of the accident he was walking rapidly, and there is nothing in the record to indicate negligence from that fact alone. The cars were approaching at not to exceed one-half the speed of a rapid walk. He was within from twenty to twenty-five feet of the switch, just beyond which was the car to be coupled, when he stepped upon the track. The law does not define just how near to a car a brakeman may, without negligence *per se,* step upon a track to couple cars. Without the guard rail as an element of danger, could it well be said, as a rule of law, that it would have been negligent for the plaintiff to have stepped between the rails, with a smooth track, to walk twenty or twenty-five feet, when the speed of the moving cars was half, or at any rate much less than, his own? Without a purpose to relax any rule of law requiring caution in the performance of

such duties, we think no such a rule has or should obtain. We attach much importance to the very low rate of speed of these moving cars, and the good condition of the walking, where the track was ballasted or surfaced to the top of the ties. If this view is correct, will the added condition of the guard rail operate to change it? The evidence is such that the jury could have found that the plaintiff's foot was caught because of the blocking between the guard and main rails becoming defective. After the accident it was demonstrated, by actual experiment, that a foot could be caught there, which a proper blocking would have avoided. Now, it has been held, so many times as to be the law beyond a doubt, that an employee may assume that condition, in such respects, which ordinary diligence requires on the part of the company. It does not appear that the plaintiff knew of the defective blocking, or had a reason to apprehend it. We think, in view of the entire situation, that the question of contributory negligence was purely one for the jury. The facts are such, to say the least, as to present a question about which there might be a difference of opinion among persons of ordinarily good judgment. The question in such a case, is one of fact. *Whitsett v. Chicago, R. I. & P. Railway Co.*, 67 Iowa, 150; *Mathews v. City of Cedar Rapids*, 80 Iowa, 459.

There is but one other question which we think it important to consider. The appellant, in argument, says: "The contributory negligence of Kroener constitutes the prominent, and, indeed, decisive, question upon this appeal." Concurring in that view, we need only add that we have considered all the points urged, and we think there is no reversible error.

II. The judgment is for twelve thousand dollars, and it is said to be excessive. The plaintiff at the time 2. —: —: —: of the injury was twenty years of age, and excessive verdict. had, under the evidence, an expectancy of

life of forty-two and two-tenths years. He was then earning sixty dollars per month. The verdict is far beyond the average in such cases. The condition of the plaintiff is much less than total disability. We know, from common observation, that men with the loss of a foot engage in the pursuits of life, and their earnings are fairly proportionate to others. That this young man can, by ordinary diligence, earn one-half of what he was receiving before the injury, or more, is not to be doubted. To him it is, of course, a life of inconvenience, and, because of his condition, one of regret or anguish. He has, besides, been a physical sufferer, and all these matters are to be considered. The amount of this verdict places this young man, almost in his boyhood days, in possession of a competency in excess of the average accumulation of a lifetime. At six per cent. interest, his receipts equal his former earnings, and, barring his suffering, make his misfortunes really a benefit. Few of his class, in their riper years, achieve so good a financial result. This court has sustained some large verdicts; but one, however, larger than this. In *Deppe v. Chicago, R. I. & P. Railway Co.*, 38 Iowa, 592, the plaintiff's thigh was crushed, and he received severe internal injuries. It is said: "His suffering was protracted, and most intense; having to endure for seven weeks the most excruciating torture of machinery and appliances used by surgeons to prevent a shortening of the limb, which, however, was unavailing." It is said in the opinion that he was deprived of the ability to labor, upon which he was dependent for support. The judgment was for nine thousand dollars. *Belair v. Chicago & N. W. Railway Co.*, 43 Iowa, 662, is a strong case, also of a brakeman, and a verdict of eleven thousand dollars was sustained. The opinion refers, in support of the holding, to the testimony of the physician that the plaintiff was "totally and permanently disabled." In *Funston v. Chicago, R.*

*I. & P. Railway Co.*, 61 Iowa, 452, the verdict was for eight thousand dollars, and sustained; but it appears that the leg was broken near the hip joint, and the fracture failed to unite, and the plaintiff would be a sufferer "as long as he may live." In *Collins v. City of Council Bluffs*, 32 Iowa, 324, a verdict for fifteen thousand dollars was at first sustained by a divided court, but the facts to sustain it are of the strongest kind. It is said the plaintiff, who had been an active, useful woman, had been "reduced to a helpless cripple for life—a burden to herself and her friends." Upon a rehearing of the case the judgment was reduced to ten thousand dollars, again by a divided court. In *Pence v. Chicago, R. I. & P. Railway Co.*, 79 Iowa, 389, a judgment for fifteen thousand dollars was sustained, but it was the case of almost total disability of a physician, with an annual income of from twelve to fifteen hundred dollars, and an expectancy of twenty-three years. He had, besides, incurred much expense. The amount is said to be large, but not the result of passion or prejudice. We have not attempted to notice all the different facts of these cases, *pro* and *con*, for they are many; but we reach the conclusion that the cases are very conclusive against the justice of the verdict in this case, and we are led to the belief that prejudice or passion influenced its return by the jury. The plaintiff should be fairly compensated for the damage he has sustained, in view of all the elements to be considered in estimating them, but more than this has been granted. If the plaintiff shall within sixty days file in this court his *remittitur* of the judgment for damage in excess of eight thousand dollars, the judgment will stand affirmed; if not, it will stand from that date reversed, and a new trial ordered. REVERSED.

KINNE, J., took no part in this case.