JOHN CANFIELD, by Letta Canfield, his next friend, Appellee, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

**Instructions:** STATING THE ISSUES: COPYING THE PLEADINGS. It is the duty of the court to cull from the pleadings the exact matters to be submitted to the jury and to confine their attention thereto; and while ordinarily it is bad practice, at least, to copy the pleadings in stating the issues, still where they contain a clear statement of the issues to be tried prejudice will not be presumed from the mere fact that they are copied by the court; and if it appears from the statement so made that all matters involved were clearly presented and that the jury could not have been misled thereby a reversal will not be ordered on that ground.

**Railroads:** INJURY TO SECTIONMAN: CONTRIBUTORY NEGLIGENCE: EXERCISE OF CARE. A section hand who is subject to the orders of his foreman, and for whose negligence he is not responsible, is not required to use reasonable and ordinary care to keep the track clear for trains; and when injured by a collision of the handcar, upon which the crew was riding, with a passing train he is not precluded from recovery because of failure to exercise such care.

**Same:** CONTRIBUTORY NEGLIGENCE: INSTRUCTIONS: EVIDENCE. On an issue as to the negligence of a section hand in riding upon a handcar in charge of the foreman at the time of his injury, the evidence is held to present a question for the jury; and that a verdict for plaintiff was not opposed to the court's instruction on the subject.

**Same.** A section hand riding upon a handcar in charge of the foreman, who looked and listened for an approaching train but failed to see or hear one, was not negligent in continuing upon the car.

**Personal injury:** EXCESSIVE DAMAGES. The plaintiff in this action was a section hand eighteen years of age, with but little education and no special skill, and earning at the time of his injury about $36 per month. He was struck by a passing train while

riding a handcar in charge of the foreman and thrown some distance, striking upon his head. His right knee was mashed and the bone broken just above it; his left hip and the bone of the leg were broken; his right arm was broken in three places and the shoulder injured; there were several cuts about the head and face and his scalp was torn off; he suffered great pain and was to considerable expense for nursing and medical attendance. At the time of the trial he was able to be about on crutches but could not dress himself: his left leg had healed but was materially shorter than the other, and his right arm could not be straightened; the injury to his right leg was not healed and the testimony tended to show that a part of the bone was dead, that the wound was incurable and would have to be constantly dressed. That he will suffer much pain in the future; that he is a nervous wreck and physically and mentally incapacitated for the future is quite clearly shown.

*Held,* that a verdict for $49,000 is excessive and plaintiff is required to elect whether he will accept a judgment for $25,000 or submit to a new trial.

**Same:** MORTALITY TABLES. Mortality tables are based upon the experience of men in health, or at least not seriously injured, and are not the proper basis for computing future suffering, expenses or other prospective damages, where the injured person is rendered a physical wreck and it is certain that he will suffer much future pain.

**Excessive verdict:** REDUCTION BY COURT: ELECTION. Where excessive damages have been allowed the appellate court is not required to remand the cause for a new trial, but may order the plaintiff to elect whether he will accept judgment for such sum as in the opinion of the court will not be excessive, or submit to a new trial.

*Appeal from Iowa District Court.*—HON. R. P. HOWELL, Judge.

SATURDAY, MAY 15, 1909.

ACTION at law to recover damages for personal injuries sustained by John Canfield, a minor, while in the defendant's employ as a sectionman. Defendant answered by a general denial. Trial to a jury, verdict and judgment for plaintiff in the sum of $49,000, and defendant

appeals.—*Reversed* and *remanded,* unless remittitur be made.

*Carroll Wright, J. L. Parish* and *C. E. Vance,* for appellant.

*Leach & O'Brien* and *Wade, Dutcher & Davis,* for appellee.

DEEMER, J.—On January 20, 1906, plaintiff, then a minor eighteen years of age, was employed as a sectionman by defendant; and, while riding upon a hand car with other employees in the performance of his duties under the orders and personal supervision of the foreman of the· section crew, the car upon which he was riding was struck by a freight train coming from the south, at what is claimed was a high and dangerous rate of speed. The day was a very foggy one, and the engineer of the freight train testified that he could not see over fifty feet ahead of his engine. Plaintiff claims that the train was run without .signals, and without reference to the safety of men were known to be rightfully on the track in the performance of their duties. The headlight·on the engine was not burning, and it is claimed that no precautions were taken for the safety of employees. The negligence charged against the defendant in the original petition was as follows: "(1) That the said extra freight train was operated upon said line of railway without any notice to, or knowledge upon, the part of said sectionmen; (2) that the regular train which went north while the section crew were eating their dinner at Bryantsburg failed to carry signals to indicate that an extra train would follow, as it was charged was the usual and ordinary custom in the operation of trains on the defendant's road; (3) that the train with which said hand car collided failed to carry a headlight on the front part of the train, as it was alleged it should have

carried in accordance with the rules of the defendant company; (4) that the employees of the defendant in charge of said train with which the said hand car collided were negligent in failing to whistle for a crossing which it was alleged was located about forty rods north of where the said train struck the said hand car, or to ring the bell, all as required by the statute; (5) that the persons in charge of said train failed to whistle for a crossing alleged to be located some distance south of where said collision occurred, or to ring the bell continuously until such crossing was reached; (6) that the persons in charge of said train were negligent in that they operated it at too high a rate of speed; (7) that the persons in charge of said train failed to give signals, from time to time, of the approach of said train to warn persons who might be upon defendant's track; (8) that the defendant was negligent in failing to provide and promulgate suitable and adequate rules governing the conduct of men in control and operation of trains in a fog, so that men upon the section would be advised in some way of the approach of trains so they could protect themselves from injury." In an amendment to the petition plaintiff struck out the first, second, fourth, fifth and eighth allegations of negligence so that the case was for submission on the third, sixth and seventh specifications.

In submitting the case the trial court copied the original petition, making no reference to the amendment to the petition, and also copied the substance of the defendant's answer. This statement of the issues was followed by this instruction: "From the foregoing statements of the claims made by the parties, and governed by these instructions, you will proceed to determine as to whether or not plaintiff is entitled to recover. The burden of proof is upon the plaintiff to establish his cause of action and the liability of the defendant by a preponderance of the evidence; and, if he has not done so, he can not recover."

1. INSTRUCTIONS: stating the issues: copying the pleadings.

Parts of the fifth, seventh and eighth instructions given by the court read in this wise:

As stated, the burden of proof is upon the plaintiff to establish his cause of action and the liability of the defendant by a fair preponderance of the evidence. Now, therefore, before the plaintiff can recover for any injury sustained by him, if any, he must show the defendant, through its agents or employees, was guilty of some negligent acts of commission or omission which were the direct and proximate cause of the injury, if any; in other words, that the defendant was guilty of negligence. You will therefore proceed in the light of these instructions to determine as to whether or not the defendant, through its agents or employees, was guilty of negligence in the handling of said extra train upon the date of the alleged injury, and at the time of the alleged accident, and whether or not such negligence was the direct and proximate cause of such injury, if any, and whether or not the plaintiff was guilty of contributory negligence as heretofore defined; and, if you find that said injury, if any, was caused by the negligence of defendant, and without any fault or neglect on the part of the plaintiff which contributed to said injury, if any, then you will find for the plaintiff, but if you do not so find, you will find for the defendant. (8) You are instructed that, before you can find for the plaintiff, you must not only find that the defendant was guilty of some one or more of the acts of negligence claimed, and that such act of negligence was the proximate cause of his injury, but you must also find, etc.

In this connection the defendant asked the court to give the following instruction, which request was refused: "You are instructed that, before you can find for the plaintiff, you must not only find that the defendant was guilty of some one or more of the acts of negligence set out in his petition and submitted to you by these instructions, and that such act, or acts, of negligence was the proximate cause of his injury, but you must also find," etc. If this were the entire record relating to this matter, the case would undoubtedly be one for reversal; for we have frequently

held that it is the duty of the trial court to cull from the pleadings the exact matters to be submitted to the jury, and that it is bad practice, if not reversible error, to copy the pleadings, leaving it to the jury to discover just what points are to be considered by them. *Swanson v. Allen,* 108 Iowa, 422; *De Wulf v. Dix,* 110 Iowa, 557; *Welch v. Insurance Co.,* 117 Iowa, 398; *Erb v. Insurance Co.,* 112 Iowa, 363, and cases cited. Moreover, it is the duty of the court to confine the jury to a consideration of the exact grounds of negligence charged and relied upon, rather than to permit them to find negligence of some sort, whether charged and relied upon or not. *Manuel v. Railroad,* 56 Iowa, 655; *Gorman v. Railroad,* 78 Iowa, 518; *Edwards v. City,* 138 Iowa, 421; *Ramsey v. Railroad Co.,* 135 Iowa, 332. Of course, where the pleadings contain a clear statement of the issues, so that when copied they intelligently present the very matters to be tried, there is no error in copying them in stating the issues, although as a general rule it is better for the court to state the exact matters to be tried in its own language, omitting all extraneous or collateral matters, and especially taking from the case all issues which have been withdrawn. *Crawford v. Nolan,* 72 Iowa, 673; *Welch v. Insurance Co., supra; German Ins. Co. v. Railroad,* 128 Iowa, 386; *Graybill v. Railroad,* 112 Iowa, 738; *Dean v. Carpenter,* 134 Iowa, 257. Where the pleadings are copied for a statement of the issues, no prejudice will be presumed, but the court will look to the statement so made; and, if it appears that the issues are so stated as to clearly present the matters involved, and there is no reason to believe that the jury may have been misled thereby, no reversal will be ordered.

Going to the petition in this case, we find that the specifications of negligence are clearly stated, and that there is no reason to believe that the jury was in any manner misled, unless it be that they were not confined to the express specifications of negligence upon which plaintiff re-

lied. In determining this latter question the instructions should be considered as a whole; and, if it appears therefrom that the exact grounds of negligence relied upon by plaintiff were clearly stated, and their inquiries were confined thereto, and not to some other or imaginary grounds, no harm resulted. *Hawkins v. Young,* 137 Iowa, 281; *Beans v. Denny,* 141 Iowa, 52; *Kenny v. Ins. Co.,* 136 Iowa, 140.

It will be observed that in the eighth instruction quoted the court does refer to the acts of negligence claimed by plaintiff and not to negligence generally, and it also gave the following: "You are instructed that the defendant railway had the right to run its trains over the road any hour of the day, and the fact that the train in question was an extra, or not running on scheduled time, could not constitute negligence, and that plaintiff was bound to apprehend that a train might be passing over the track in question in any direction at any time, and reasonable and ordinary care required that he should, in passing over the track in a hand car conduct himself with reference to the peril incident to the movement of such train, and that such train would have the right of way over the track at the place of accident." It seems to us that the instructions as a whole, submitted to the jury the very acts of negligence which plaintiff was relying upon, to wit, failure to carry a headlight, high rate of speed, and failure to give signals. This is a copy of the specifications of negligence as stated by the court in its instructions: "That at 1:30 p. m. while so operating said car in the fog, defendant, through its agents and employees, ran an extra freight train north along said line at a high and dangerous rate of speed, without any signals, and without any notice to said Canfield or to his foreman, and ran into said hand car; that ordinary care and diligence, and due regard for the safety of said Canfield, required that in view of the heavy fog, which rendered it almost impossible to see any distance

ahead, the said engine on said extra train should have had
a headlight, and should have been operated at a moderate
rate of speed, and that the same should have been operated
with repeated signals from time to time, so as to warn
said section hands, including Canfield, of the approach of
said train, and plaintiff alleges that said train was careless-
ly operated at a high rate of speed without any headlight,
and without warning, and without signals, and that the
same could not be seen or heard, and was not seen or heard
until it was almost upon them." It seems to us that the
jury was clearly instructed as to the grounds of negligence
relied upon, and that it was limited by these instructions
to a consideration of the very acts of negligence claimed.

The third instruction asked by defendant, which we
have heretofore set out, was substantially given by the court
in its charge. It will be noticed that this refers to the
negligence charged in the petition and submitted by the in-
structions. In the one given by the court the reference is
to the acts of negligence claimed. This, of course, had ref-
erence to the negligence claimed in the petition. In the
sixth instruction the jury was again charged inferentially
that plaintiff must be confined to injuries received as al-
leged by him. There was no error here of which defend-
ant may justly complain.

II. Defendant requested the following instruction:
"You are instructed that the train in question had the right
of way over the track at the point of the accident, and
that the employees upon said train had the
right to presume that the plaintiff would use
reasonable and ordinary care to keep said
track clear for the passage of said train,
and to avoid injury from the movement of
said train upon said track." In lieu thereof the court
gave the ninth instruction, which we have heretofore
quoted. The instruction asked by defendant does not cor-
rectly announce the law. Plaintiff was a section hand,

2. RAILROADS:
injury to
section man:
contributory
negligence:
exercise
of care.

having no control over the operations of the hand car, and he was not compelled to keep the track clear. He was subject to the orders of his foreman, and the foreman's negligence, if any, can not be imputed to him. True, he was bound to the exercise of ordinary care and prudence for his own safety, but this did not impose upon him the duty of keeping the track clear. It may be that, as bearing upon the negligence of defendant's employees, the duty of the foreman of the section gang, his custom, and the rules of the company might be considered, but the instruction asked does not cover this thought; and, as it announced an erroneous rule, the trial court was justified in refusing it. The ninth instruction was even more favorable to defendant than was justifiable under the facts disclosed by the record.

III. It is contended that the court should have directed a verdict for defendant on the ground of plaintiff's contributory negligence, and that the verdict is contrary to the eighth and ninth instructions. We have

3. SAME: contributory negligence: instructions: evidence.

already copied the ninth instruction and a part of the eighth, and we now set forth the remainder of the eighth. It reads in this wise: "In determining the question of whether or not the plaintiff was free from negligence which contributed to his injury, you will take into consideration the density of the fog at and in the vicinity of the place of the accident, the plaintiff's knowledge thereof, the speed at which the hand car was moving at the time of the accident, the noise which the hand car made running upon said track, the knowledge that plaintiff had of the possibility that a train might be approaching from the south, his means of escaping injury after he could see a train approaching from the south, and all the other facts and circumstances in evidence bearing thereon; and if, in view of all the facts and circumstances shown in evidence, you fail to find that plaintiff used reasonable and ordinary care in riding the

hand car down into the fog, at the time and place in question, your verdict will be for the defendant." We shall not set forth the testimony bearing upon this proposition. Suffice it to say that we think the question of plaintiff's contributory negligence was for the jury, and that the verdict is not opposed to the instructions referred to.

It should be remembered that plaintiff had no control over the hand car upon which he was riding. That was in charge of the foreman of a section gang in defendant's service. Plaintiff testified that he was looking out and listening for a train while on the car, and that he did not see or hear it. Having no control of the car or of its speed, there was nothing more that plaintiff could do. As sustaining this view, see *Campbell v. Railroad,* 45 Iowa, 76.

4. SAME.

IV. The last error assigned is that the verdict is excessive, and so large as to indicate passion and prejudice, and for this reason should be set aside. Plaintiff was, when injured, a section hand, earning $36.40 per month. He was thrown something like twenty-five feet by the train which struck the hand car, and lit upon his head. His right knee was mashed, and the bone broken just above the knee. His left hip was broken and left leg broken about the middle. His right arm was broken in three places, and the right shoulder hurt. His nose was cut, and there were cuts over the eye, over the eyebrow, and on the chin, and his scalp was torn off. Indeed his escape from instant death was almost miraculous. He has suffered great pain, and has been to considerable expense for nursing and medical services. He is able to hobble around on crutches, but can not dress himself. According to the doctors, he is hypersensitive, or, as he himself describes it, very nervous. Regarding his present condition, we now quote from the testimony of one of the doctors, who was a witness for plaintiff.

5. PERSONAL
INJURY:
excessive
damages.

Q.  Now, doctor, I just want to ask you a few
questions relative to this wound while it is undressed, and
I want to ask you a little touching the space you see in that
hole there, in this cavity?  A.  That is a dead bone.  The
cavity is about one and three-quarters of an inch deep.
The bone you see there is the lower extending portion of
the femur, called the condyles.  That forms the upper
surface of the knee joint.  This fracture was at the lower
end of the upper fragment.  This hole here is right in
the lower end of the femur.  He has been in this condi-
tion since September, 1906.  There has been a change in
his condition during this time, but there is no change
in the condition of the bone itself.  The hole is a hole
right into the bone.  The hole is one and three-quarter
inches by one and one-half inches in length and width.
It came originally from fragments, disunited fragments,
and it is also due to poor circulation for a considerable
length of time, which causes impoverishment of the bone.
There is a trifle of movement in the bone now.  It has
been no better at any stage of the case since the operation
in September.  In my opinion there is no cure for it.  I
dress it every second day.  In dressing it I.pack the hole.
. . .  I first saw John Canfield a few days after his in-
jury.  I went over and helped Dr. Shellito put a cast on
his left leg for the fracture of the hip.  At that time the
fracture of the hip had only a temporary dressing.  There
was a fracture of the hip and a fracture of the left leg in
the middle of the thigh.  I did not make any examination
of the right leg at that time, nor of the shoulder.  I saw
him in September when he had the operation.  There was
a malposition of that fracture; that is, a wrong position
of the bone in the right leg.  I assisted in that operation.
The lower end of the upper fragment was protruding
through the skin at just about the site of that opening now,
and on opening down in the fracture had united with
bone union at the upper part of the broken surface with
a bridge of bone tissue about the diameter of my little
finger, and beneath that there was some fibrous union of
the bone, and interposed at the lower part of the fracture
was some fragments of muscle fiber where the rough bone
had been driven through the muscle when he was injured.
A portion of the upper fragment was protruding obliquely

through the skin on the outside of the right leg. The lower fragment—that is, the condyles—were soft enough so that you could pinch it away, and the inside could be skipped out with the finger. That is the spongy portion of the bone called the cancellous portion of the bone. The fragments were separated, and all this fibrous tissue removed. I turned back the flesh. The cutting was done on the outer surface of the lower part of the thigh. The cut extended for perhaps 10 inches as you saw the scar, and deep enough to expose the bone. After we got down in there and found this condition, we separated the fragments, destroyed the bony union that had taken place, and trimmed off the edges of the bone so they would fit one within the other, and then drilled holes in the bone and sutured it with silver wire, and as an additional protection drove a nail in it. He was on the table probably an hour and a half, and was under an anaesthetic during that time. There was present besides myself Dr. Shellito, Dr. Agnew, and the nurse. After we had sutured and nailed it, the soft parts were prepared and dressings applied and sewed up. The fibrous tissues which we saw were in between the surface, and the broken part was all cut away and cleaned out. I think I saw him once or twice a week after the first couple of weeks. The cavity in the bone failed to heal. It has been the way it is now since last March. The condition is due to insufficient nourishment. By that I mean the blood supply to the broken portion of the thigh bone was cut off for the reason that the fracture occurred below the part of the bone from which comes the artery supplying the bone, and by these fragments not being in good condition the lower part of the bone failed to get a sufficient amount of blood to keep it in a good healthy condition. That condition is what laymen refer to as 'dead bone.' I assumed complete charge of the case in March. There has been very little change in the condition of the leg since that date. The leg has not been healed up at any time I have seen it since the operation a year ago. It is not possible that it can heal while that condition of the bone exists. In my opinion there is no remedy or method known to science or surgery for relieving that condition. I have seen him every second day since March. Q. What is going on there all this time? I mean what has been there

in this wound? A. There has been very little pus about
it; just maintains that sluggish, slow, ulcerated process;
doesn't grow any deeper; doesn't get any better. I think
as long as infection is avoided, I think it can be kept
open and kept as it is. It may become infected. In case
of infection then you would have suppuration of the bone.
In that event possibly you might have to amputate his leg,
and possibly you might have to bury him. There has not
at any time been any more movement in that leg than there
is now. In my opinion there is no probable condition in
the future in which there will be any more movement. The
shaft of the femur is affected from the knee extending to
the point of the fracture. The femur is the bone extend-
ing down from the thigh. The affection extends up to the
middle of the thigh. In case of amputation it would have
to be in the upper third of the thigh. He is hypersensitive.
By that I mean from the injury to his leg the nerves are
more sensitive; that is, a slight irritation appeals to him
more than had he never been injured. I have not had oc-
casion to observe this as to other portions of the body as
much as in connection with the leg. This hypersensitive
condition is manifested by his starting when he is touched
or injured in an inconsistent way in dressing, or by com-
plaint of him when really the amount of pressure ought
not to produce pain. When a person is hypersensitive, if
you touch his flesh with the finger, it appears to him as
pain. . . . The dressing of that leg sometimes de-
mands more attention than others, for the reason that at
various times little fistulae break, and they open up and
discharge portions of the dead bone, and on account of that
it sometimes takes longer than others to dress it. . . .
By fistulae breaking I mean little spots open and slivers
of bone discharge. These have appeared on nearly every
aspect of the thigh. By that I mean all sides around the
fracture, from the forward surface to posterior. One
opened about a month ago, and there is one about ready
to open now. I first learn of this because they become
tender, and they then become reddened and discolored,
and then the skin breaks open and there is a discharge of
bloody serum and slivers of bone. So far as the surface
of the leg is concerned the fistulae has no connection with
the hole in the leg. These dressings will have to continue

just as long as the leg remains in this condition. There is
no indication of any cure of that condition. In my judg-
ment it will require a dressing every two days, and I can
not see any prospect of any change in the future.

Cross-examination:

The purpose of the operation that I have spoken of
in the right leg was to restore the malposition of the frac-
ture. I think the operation was on the 27th day of Sep-
tember, 1906. I saw him, I think, perhaps twice a week
for the first two or three weeks, and I took full charge of
the case on the 12th of March. Dr. Agnew had immediate
charge of the case from the time of the operation up to
the 12th of March. I don't believe I saw him after the
expiration of the first two weeks until I assumed charge
of the case. At the time of the operation he had a badly
united fracture, and the end of the bone was protruding
through the skin.

The testimony tends to show that the left leg, while
healed, is three and one-half inches shorter than the other.
The right arm has healed, but plaintiff can not straighten
it out. Defendant's testimony tended to show that an
operation would relieve the situation as to the right leg—
that is to say, an amputation which would relieve plain-
tiff's future suffering—while one of plaintiff's witnesses
testified that an operation would be more dangerous than
to leave the limb in its present condition. The testimony
showed that plaintiff was able to dress himself on one
of the days of the trial; but there is no doubt that, as
long as his right leg remains in its present condition, it will
require medical attention, dressing, and care. Of course,
plaintiff, should he live, will be deformed, and will not,
in all human probability, be able to perform any further
labor. His earning capacity has already been referred to.
Enough has been said to show plaintiff's claim as to the
extent of his injuries, and it is manifest that he has been
very badly injured, has suffered great pain, and that he

will suffer in the future. He can no longer earn money through manual labor, and it is doubtful if he can do so in any other way.

Counsel say that plaintiff's expectancy of life is nearly forty-three years, and they base their argument in support of the verdict on this proposition. As to the pecuniary injury to his estate, this is doubtless permissible, but in estimating his future suffering and the expenses he will be to, and all other matters which have to do with prospective damages, it is perfectly manifest the life tables can not be accepted as a basis. The statistics from which these were compiled were not based upon the experience of men crippled as plaintiff is, but upon men in health, or, at least, upon men who were not injured as plaintiff was, and they afford no criterion whatever as to plaintiff's expectancy of life. If he be injured as badly as his surgeons say he is; is suffering as they claim; is as nervous as they would have us believe; has the exposed bone and running sores; and the liability to infection as they describe—he is not likely to live many years. Indeed, his time, if he be injured as claimed, must of necessity be short. Of course, an operation may prolong his life, but if that be true, he will be relieved of his bodily suffering, although not his mental, due to his deformed condition. We wish to point out at this time this fundamental fallacy underlying the argument made by counsel.

6. SAME:
mortality
tables.

Now going to the verdict of $49,000. Undoubtedly this is one of the largest ever returned in a personal injury case. Indeed, it is the largest one of which we have any knowledge, considering the position in life and earning powers of the party injured. His income, when injured, was about $435 per year. He was an unskilled section hand, and in all probability would never have risen above menial employment, at least there is nothing in the record regarding his antecedents which would indicate anything

else.  He has no education, and no special talent is shown. In all human probability he would never have advanced into any department of labor requiring special skill.  Based upon earning power alone, there is nothing to indicate that he would have ever earned sufficient money so that he might have lived upon the revenue therefrom.  It is a sad fact, but nevertheless an open one to all thoughtful men, that few live to their full expectancy, and that of those who do a still smaller proportion have laid by enough to keep them during their declining years.  The great majority of them are dependent upon their daily labor, or upon their friends and relatives, for support.  Of course, plaintiff's might have been the exceptional case, and this should be taken into account.  But there is nothing in his previous history which tends to show that he would have increased his earnings, or that he would have saved any more thereof than the average man.  Plaintiff's counsel in support of the verdict argues that the expenses of living have increased during the past ten or twelve years, and that the necessaries of life, nursing, medicines, professional services, etc., are more than they used to be.  This argument is, of course, potent in considering prospective damages, but it is a two-edged sword as applied to plaintiff's probable accumulations, and the damages to his estate. It appears that his salary had not increased in proportion to expenses; and, if the proposition be true that the cost of living has increased without a proportionate increase in earnings, it is manifest that, had he lived to his full expectancy, he would not have accumulated and saved as much as he would have done before this increase of the cost of living.  Assuming, however, that he can not in the future earn anything by manual or other labor, this increase in expenses may well be considered, as also the fact that interest rates are not as large as they used to be, but he was not, by reason of his injury, put into a different station or position in life.  That is to say, he is entitled

to no better living than he would and could have provided for himself had he not been injured. He is entitled to compensation for present, past and future pain and suffering, and to an amount sufficient to meet his past, present and future expenses caused by the injury. But as already stated, he is not entitled to compensation for these on the theory that he will live to his full expectancy. This seems to be the theory on which the case was presented to the jury, and it was plausibly argued before us; but such an argument is without foundation, in that it proceeds on an entirely wrong basis.

Again, in justification of the verdict, we are asked to say what amount would induce us to voluntarily put ourselves in a position to receive such injuries. Of course, the answer would be: No sum could be named which would be sufficient. This is another fallacy, but one which undoubtedly appealed to the trial jury. Plaintiff was permitted to exhibit his limb upon which there was a running sore, and in which the bone was exposed, to the jury, and a doctor was permitted to explain the situation, and give both his diagnosis and prognosis of the case. Whilst there was nothing erroneous in this, or at least defendant makes no complaint of it, the very situation was one which appealed strongly to the sympathy of the jurors, and was calculated, unless they were extremely well poised, to move them from their moorings, and lead them, out of compassion, to allow the last farthing, on the theory that no sum would be too large if confined within the limits of the petition. We do not wish to, nor do we intend to, usurp the functions and province of the trial jury, but it is our duty under our oaths to consider these cases carefully, and see that no injustice is done either to an injured plaintiff or a negligent defendant. With us it does not matter that the defendant is a corporation and the plaintiff a poor laborer. Plaintiff's damages are not to be augmented by reason of the one fact, or reduced

because of the other. If plaintiff's injuries had been received at the hands of a farmer, or of a copartnership made up of men in the locality, or of a co-operative society made up of men in the county where the case was tried, there would, we think, be but one opinion regarding the size of this verdict. It is not too much to say we think that it would have been shocking to the entire community. The fact that defendant is a railway corporation, and able to pay whatever amount should be allowed, must not be allowed to change the rule. Equality in law, and under the law, is guaranteed to every one, whether rich or poor, and the safety of our institutions as well as the permanency of society, demands that no one be made to suffer more than another in the same situation. In fairness to counsel it must be said that he makes no claim to the verdict because defendant is a corporation. He is too honorable a man to do that. But we do believe that this verdict is either the result of passion and prejudice, or was based upon false premises, and can not be sustained. It was either based upon the fact that defendant was a railway corporation, was due to some fallacy in argumentation, or grew out of a large hearted sympathy, which is commendable in its place but which can not be made the basis of a verdict. The verdict is so excessive that all the members of the court are of opinion that it cannot be sustained, and should have been set aside.

Following the almost uniform course of procedure in such cases, we do not make an absolute order remanding the case for another trial, but shall allow plaintiff to elect whether he will take another trial, or accept a certain amount, to wit, a sum designated by the court as the largest amount which would not seem to the court to be open to the objection of being excessive. That sum, in our opinion, is $25,000; and, if plaintiff shall elect within sixty days from the filing of this opinion to accept a judgment for

8. EXCESSIVE VERDICT: reduction by court: election.

$25,000, with six percent interest from the date of the filing of this opinion, he may take such judgment in this court.    Otherwise the case must be remanded, and the judgment reversed.    That this is a proper procedure is determined by a long line of cases.    See *Cooper v. Mills Co.,* 69 Iowa, 350; *Hunter v. Davis,* 128 Iowa, 216; *Howe v. Sutherland* 39 Iowa, 484; *McKinley v. R. R. Co.,* 44 Iowa, 314; *Lombard v. R. R. Co.,* 47 Iowa, 494; *Struble v. R. R. Co.,* 128 Iowa, 158; *Kroener v. R. R. Co.,* 88 Iowa, 16; *Collins v. City,* 35 Iowa, 432; *Wimber v. R. R. Co.,* 114 Iowa, 551; *Noel v. Dubuque Co.,* 44 Iowa, 293.    This is by no means a complete list of the cases wherein this procedure has been followed.    With the possible exception of one, all the judges who are now sitting, or who in the past have sat, upon this bench have agreed to this method of disposing of such cases, and it has the approval of most of the courts which have had occasion to consider the matter.    It has been approved in Arkansas, California, Florida, Illinois, Maine, Minnesota, Montana, Nebraska, New Hampshire, New York, Tennessee, Texas, Utah, Washington, Wisconsin, and the United States Supreme Court.    See cases cited in 3 Cyc.. 436, 437.    The procedure is sustained upon the theory that the court does not substitute its judgment for that of the jury; but, being convinced that the verdict is too great, it merely indicates an amount which it would not feel at liberty to pronounce excessive.

For the reasons pointed out, the judgment must be, and it is, *reversed.*

LADD, J.—I concur in the above opinion save the amount of the judgment plaintiff is permitted to accept, and that I do not think should exceed $18,000 or $20,000.