HAZEL E. RULISON, Appellee, v. VICTOR X-RAY CORPORATION, Appellant.

896

MARCH 5, 1929.

*Parrish, Cohen, Guthrie, Watters & Halloran* and *Vernon W. Lynch,* for appellant.

*Hallagan, Fountain & Stewart,* for appellee.

EVANS, J.—The alleged injury was caused to plaintiff on September 15, 1924. At that time, she was engaged in the employment of Dr. Welpton, as office woman and assistant, and had been so engaged for a period of about 16 years, and was earning a salary of $125 per month. The defendant, through one Watson, was negotiating with Dr. Welpton for the sale of an X-ray machine and the installation of the same in Dr. Welpton's office. On the date named, Watson installed in the doctor's office a secondhand X-ray machine, brought from another town. He desired to complete the installation and to make a demonstration on that date. Dr. Welpton was not present. At the request of Watson, the plaintiff submitted to an exposure of herself to the machine, for the purpose of demonstration. The cone was applied to her head, and three pictures thereof were taken in succession, with brief intervals, at one sitting. The focal point was the occipital lobe of the brain. Some days thereafter, the plaintiff began to feel soreness in her head. The pain increased, and the first outward symptom was the loss of her hair from an area four inches square. Other troubles followed in succession. She developed a chronic condition of sick headache, referred to in the record as "ophthalmoplegia migraine." Her right eye became affected. The muscles of accommodation of the pupil ceased to function. The eyelid also was affected. The claim for plaintiff is that this condition was the result of injury to the third cranial nerve, which has its origin at the occipital lobe of the brain. Menopause occurred. She was then 36 years of age; whereas 47 years is the average age of the appearance of menopause. The trial below was completed on November 26, 1927. During the intervening three years, according to the evidence for plaintiff, she has been a constant sufferer, and under constant disability, and without any cessation of the specific injuries herein referred to. The jury awarded her a verdict of $4,500, upon which judgment was entered.

It is claimed by the defendant that no negligence was proven; that the only specification of negligence submitted by the court to the jury was one not pleaded; that no causal rela-

898

tion was shown between the menopause and the X-ray demonstration; that none was shown as between the injury to vision and such demonstration; that such X-ray treatment was not shown to be the cause of the migraine; that the court submitted an improper measure of damage.

This indicates the general character of the issues presented for our consideration.

I. The defendant's first contention is that there was no evidence of negligence. This contention is predicated largely upon the testimony of Watson, who, as a witness, described in detail just what he did,—all of which was normal, and would necessarily be harmless. It is not disputed that an X-ray machine has a ready capacity for injury. It is requisite that it be operated by an expert, and this means intelligence and care. Negligence in its operation carries the potential of grave consequences. The only other person present at the demonstration was Miss Morgan, a graduate technician, who had been employed by Dr. Welpton for the purpose of operating the machine. She testified to various circumstances contradictory to Watson, tending to show that the machine was not under his control, and that it was delivering more current into the person of the plaintiff than as contended by Watson. The four factors which enter into the power delivered into the person of the patient by the operation of the machine are: voltage, current, time, and distance from the focal point. As time is lengthened or distance shortened, the power is accordingly increased. This power was referred to, in the testimony of the expert witnesses, as "dosage." According to the testimony of Miss Morgan, the time of the experiment was longer and the distance from the focal point was much shorter than that indicated by Watson. She testified also to the hot wires, which required an interval of stoppage to cool them off, and which indicated a want of control of the dosage which was being delivered. According to the testimony of Watson, nothing occurred which could have caused a burn to the plaintiff. He estimated the dosage at 580 milliampere seconds. This amount was concededly a normal dosage, and could not result in injury. On the other hand, the testimony from both sides indicated that the loss of hair suffered by the plaintiff was the result of a second-degree X-ray burn, and that it could not have occurred

without the application of not less than 1,200 milliampere seconds. This is not a case of *res ipsa loquitur*; but, if the evidence shows that the plaintiff did suffer an X-ray burn, and that this was her only exposure to an X-ray machine, such circumstance is not only admissible, as tending to prove improper use of the machine, but it is also a very persuasive one.

We think the proof of negligence was quite sufficient to go to the jury.

II. The defendant complains that the district court submitted to the jury, as the only ground of negligence, a ground that was not pleaded. The question thus submitted to the jury by the court was whether Watson delivered an overdosage of current. The plaintiff had pleaded ten specifications of negligence. They were all reducible to the general proposition that Watson had carelessly delivered an excessive amount of current. Nos. V and VII were as follows:

"V. By carelessly permitting a dangerous amount of electric current to pass through the machine and on this plaintiff.

"VII. By carelessly and negligently burning this plaintiff."

Nowhere in her specifications did the plaintiff use the term "overdosage." Such was the term, however, that was used by substantially all the witnesses. Before the instructions were formulated, counsel for defendant moved for a withdrawal from the jury of many, and perhaps all, the grounds of negligence alleged in the petition. In the presentation of such motion, the following colloquy occurred between the court and defendant's counsel:

"I might say, judge, that I have withdrawn all of those. There is just one ground of negligence I am permitting.

"Judge Guthrie: May the record show that all grounds of negligence are withdrawn, with the exception of that; otherwise I would make my record.

"The Court: Well, the record may show that the only ground of negligence that the court is going to submit is this: that J. H. Watson, in the taking of the radiograph of plaintiff's head, caused her to receive an overdosage of X-ray from said

X-ray machine; and that is all I am submitting to the jury.

"Judge Guthrie: With that understanding, the defendant will not proceed to ask the withdrawal; but understands from the statement of the court that they are withdrawn.

"The Court: That is all there is to it. (Plaintiff excepts.)"

Pursuant to such colloquy, the court gave Instruction No. 6, wherein he submitted to the jury the one question of negligence: whether, through want of ordinary care, Watson had "caused her to receive an overdosage of X-ray from said X-ray machine." This represents the court's interpretation of the specifications Nos. 5 and 7, contained in the petition. The fact that he departed from the exact language of the petition, and adopted that of the witnesses, is not at all material. It was not only a proper interpretation; but it was one that had been acquiesced in by counsel for the defendant in the colloquy above set forth. The final statement of counsel in that colloquy amounted to a withdrawal of his further objection, and to a waiver of objection to that particular instruction. In formulating the instruction, the court adopted the same term, "overdosage," that he had used in the colloquy.

III. The defendant complains of the ruling of the court permitting a question to be propounded to the witness Dr. Heagey. The record is as follows:

"Q. Now, Doctor, from your examination and knowledge of her condition, and the fact that there was an X-ray burn in the region of the back of her head, in September, 1924, if that be a fact, could you say whether or not, in your opinion, that burn might, could, or would have any effect upon her present condition?

"Judge Guthrie: That is objected to as incompetent, irrelevant, and immaterial to any issue in this case, and for the further reason that the evidence shows that the doctor did not see this patient until March, 1926; further reason that the witness is not competent to testify.

"The Court: You may answer that, Doctor, assuming, for the purpose of your answer, that she had an X-ray burn in the back of her head. (Defendant excepts.)

"Assuming that she had an X-ray burn, determined by her history of an exposure, the loss of hair, the onset, the symptoms described in her history, I am of the opinion that the X-ray did

definite damage to brain cells, the lining of the brain, and the patient's general system, to the extent that the patient's present complaints and symptoms were produced by this damage.''

The objection urged to this question is that it permitted the witness to take into account the history of the case, as related to him by the patient herself. The argument is predicated largely  upon the *answer* of the witness on cross-examination later. The question here objected to is only partially hypothetical. The only hypothesis stated in it was that an X-ray burn had been suffered in September, 1924. That hypothesis had abundant support in the evidence. The rest of the question refers to the witness's ''examination and knowledge of her condition.'' This presumptively referred to her then condition. It is contended that the answer of the witness indicates that he understood the question as it is now construed by counsel. No attack was made upon the answer, nor relief asked with reference thereto. The same is true as to the later cross-examination of the witness. If the question itself was proper, the ruling was proper. Nor could error be predicated upon it because of later developments in the evidence.

IV. Successive assignments of error are predicated upon the following propositions:

(1) The failure of the court to withdraw, upon motion of the defendant, all evidence concerning the menopause, in that there was no evidence tending to show causal relation between it and the alleged X-ray burn.

(2) Like failure of the court, upon defendant's motion, to withdraw from the consideration of the jury all evidence with respect to plaintiff's impaired vision.

These assignments raise a question of fact, rather than of law, and involve an examination of the record, for the discovery of evidence. The ground of error assigned quite ignores the  testimony of Dr. Heagey. It will avail us nothing to compare the weight of the evidence, as between the opposing expert witnesses. The testimony of Dr. Heagey was that the effect of an overdosage of X-ray causes swelling of blood cells, which results in obstruction of circulation, and which first breaks down the smaller veins; that any breaking down of the circulating system necessarily

shuts off the supply to parts of the body dependent thereon; that the third cranial nerve has its origin about the focal point selected by Watson; and that this nerve controls substantially all the muscles of the eye. As to the menopause, he testified that the X-ray may have a sterilizing effect upon a patient, and that it is used for just such a purpose. True, in such a case it would not be applied to the head. But if there was an excessive current, it could penetrate other parts of the body. The position in which the plaintiff was put, for the purpose of demonstration, was such as would have permitted the rays to penetrate the abdomen. At least one of defendant's expert witnesses conceded that in such a case menstrual conditions might be affected. The question at this point is one of expert opinion, and is quite incapable of direct evidence. In the light of all the circumstances, the expert opinion was sufficient to go to the jury on the question of causal relation as to both of these disabilities.

V. The defendant complains of the rule of measure of damage submitted by the court to the jury.

(1) In submitting that question to the jury, the court submitted eight interrogatories to be answered by the jury. These indicated that the jury allowed damages as follows: (1) $420  for past physical and mental pain. (2) $420 for future physical and mental pain. (3) $450 for past inability as housewife and mother. (4) $700 for future inability to perform her duties as housewife and mother. (5) $1,410 for past decrease in earning capacity as a doctor's office assistant and bookkeeper. (6) $750 for future decrease in such earning capacity as a doctor's office assistant and bookkeeper. (7) $150 for past medical treatment. (8) $200 for estimated future expense of medical treatment.

The plaintiff continued her employment with Dr. Welpton until the first of January, 1925, and received her regular salary therefor. From and after such date, as claimed by her and her husband, her disabilities had increased to such an extent that her service to the doctor was negligible, and that her service at home as housewife was greatly impaired by her continued illness and confinement. Her husband was an engineer in the employ of the Northwestern Bell Telephone Company. In December, 1925, his place of employment was changed from Des Moines to Omaha. The family, consisting of himself and the plaintiff and their little

son, moved there, and continued their residence there up to the time of the trial. It is urged by the defendant that in no event could the plaintiff recover for decreased earning capacity as an office assistant after she removed to Omaha,—she having testified that she would have moved there in any event, even though she had not been disabled. The argument is that she therefore lost nothing in the way of wages after that date, by reason of her disability. The argument is not sound. Her capacity to do the work was an asset that belonged to her, and she had the same right to avail herself of it in Omaha as in Des Moines. The point here involved is fully covered in *Whithey v. Fowler Co.,* 164 Iowa 377; *Nolte v. Chicago, R. I. & P. R. Co.,* 165 Iowa 721, 726. It is needless that we repeat here the discussion contained in those cases.

(2) It is further urged that the instructions of the court permitted the jury to substitute its own judgment of the measure of recovery, rather than to predicate the same upon evidence. The instructions of the court will not fairly bear this interpretation, except as to the measure of recovery for pain and suffering, and for disability as a wife and home-keeper. As to these items of damage, such instruction was proper. *Glanville v. Chicago, R. I. & P. R. Co.,* 196 Iowa 456; *Bridenstine v. Iowa City Elec. R. Co.,* 181 Iowa 1124; *Jacobson v. Fullerton,* 181 Iowa 1195.

It is further urged that, as to past damages, the plaintiff stopped short of proving just how much she had received of wages from Dr. Welpton after January 1, 1925; that the instructions permitted the jury to allow damages covering the very period when she received at least some compensation from Dr. Welpton. If it be true that this state of the record subjected the defendant to the possibility of excessive damages, as for past compensation lost, yet special findings appearing in this record disclose conclusively that no such prejudice was in fact suffered. Though the evidence disclosed that, for many years prior to the alleged injury, the plaintiff had been earning $125 per month, and though substantially two years had elapsed from the date of the removal up to the time of the trial, and though she had been unable to earn anything since her removal to Omaha, yet the jury allowed her for such loss only the item of $1,410. This was less than twelve

months' salary. If, therefore, the defendant was liable at all, it suffered no prejudice at this point as to the amount of this item.

(3) It is urged by the appellant at this point that plaintiff was allowed a double recovery, in that she was allowed to recover for loss of her service in an independent occupation, and also for  her disability as wife and housekeeper. This point is an interesting one, and deserves careful consideration. It is novel, in the sense that it has never arisen before, and could not arise, except for the enactment of our comparatively recent statute of emancipation of the married woman. See Section 10461 *et seq.*, Code of 1924. By this legislation the married woman is given a status independent of her husband, for loss of which she may recover in her own right. This status is that of "wife or mother." For loss sustained by her as such, she may recover, under the statute, "in addition to any elements of damages recoverable by common law."

The question is a fair one, whether a married woman and a mother who has an independent occupation, and who also occupies a home with her family, may recover in both capacities for loss of the same time and for service at the same time. The question is one which may well be guarded by trial courts in their instructions. It is only partially involved in this record. It is to be borne in mind, however, that engagement in an independent occupation by such married woman is not necessarily inconsistent with her maintenance of a home as wife and mother. To engage in an independent occupation may impair the value of her services as a wife and mother, but does not necessarily supplant it. We think it should be recognized, also, that a wife and mother maintaining a home, who has also the capacity to conduct a lucrative independent occupation, may show the value of her time and services in both capacities to be greater than it would be in one exclusively. The question is one for the jury, in any event, though precautionary instructions on the subject might well be given. The question does not appear to have been brought to the attention of the district court. No precautionary instructions were requested as to the duplication of recovery. Moreover, the special findings disclose that there was no duplication. The allowance to the plaintiff for her disability to perform her customary duty as wife and mother for three years was $450.

For the future, her loss as wife and mother was fixed at $700; whereas her future earning capacity in an independent occupation was fixed at $750. We think these findings demonstrate satisfactorily that there was, in fact, no duplication of loss.

(4) The court permitted the jury to award medical expense incurred by the plaintiff. The jury awarded $150 for past medical expenses. Her evidence of actual expenditure was $125.  It is contended that the award should not exceed the amount expended. The appellee concedes this, and offers to remit the excess. The instructions of the court also allowed the jury to award future necessary medical expenses. It is urged that there was no basis in the evidence for this instruction, and that the jury was permitted to award the sum solely upon its own judgment. The evidence was that plaintiff's disabilities were probably permanent. There was no evidence on the probable amount of future medical service. In the nature of the case, there could be nothing but an estimate. That some medical expense would be necessary was manifest. The jury awarded $200. If future medical expenses can be anticipated and provided for at all, it is not readily conceivable that they could be much less than $200.

VI. The appellant complains of alleged failure of the court to put proper limitation upon the consideration of the mortality tables. Two objections to the instruction are predicated upon  its failure to state certain matters. The only affirmative objection to the actual contents of the instruction is that it treated the mortality tables as conclusive upon the jury. We do not so read it. We find it to be replete with qualification and limitation. The instruction is too long to be set forth herein. As illustrative of the qualifications put by the court upon the tables, we quote the following paragraph:

"It is also proper for you to take into consideration, in determining the weight and credit to be given said mortality tables, facts well known to everyone: namely, that human life is uncertain, and that no one can say with any degree of accuracy how long any particular person will live. You must further keep in mind that these mortality tables do not necessarily apply to this plaintiff, but are based upon the observed expectancy

among persons in ordinary pursuits and in good condition of health."

It will appear therefrom that it does not purport to make the mortality tables conclusive. The objection that it fails to tell the jury that the tables are to be considered only in the event that plaintiff's injuries are permanent, is not well taken, as a careful reading of the instruction will show. The final objection to the instruction is that it "failed to instruct the jury that the tables could not be considered by it if it found that the injuries tended to shorten plaintiff's life." It is further urged "that the tables are not admissible, or their use permitted, when the injuries tend to shorten life." This assignment of error is predicated upon *Canfield v. Chicago, R. I. & P. R. Co.*, 142 Iowa 658. It was not held in the cited case that the mortality tables, under such circumstances, were not admissible. All serious permanent injuries necessarily tend to shorten life. The discussion in the *Canfield* case, upon which appellant relies, bore only upon the question whether the damages recovered were excessive. In that case, a verdict of $49,000 was recovered. We reduced the verdict, and allowed plaintiff to accept the reduced amount or take a new trial. In his efforts to sustain the verdict as not excessive, the appellee urged upon the attention of this court the pain and suffering which would be endured for 43 years, as the expectancy of the appellee, and that this of itself would sustain the verdict for the full amount. The language relied on by counsel was used in that case in response to this argument, and in support of our holding that the verdict was excessive. It was not held that the mortality tables were not *admissible*, nor that the trial court erred in submitting the same to the consideration of the jury. The complaint at this point is not well taken.

The foregoing comprises the principal questions argued. We find no prejudicial error in the record, and the judgment is accordingly affirmed, on condition of remittitur.—*Affirmed on condition.*

ALBERT, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.