MELVIN A. INGEBRETSEN, Appellee, v. MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY, Appellant.

**PLEADING: Amendment—Conforming Issues to Facts Proved—Discretion of Court.** Amendments conforming the issues to the facts proved are specifically authorized by statute. (Sec. 3600, Code, 1897.) So held where, at the close of the evidence, the court permitted an amendment alleging that plaintiff's injuries were permanent.

**JURY: Challenges—Overruling Challenge for Cause—Exclusion on Peremptory—Effect.** The exclusion of a juror on *peremptory* challenge precludes complaint of the overruling of a challenge for *cause* to the same juror.

**PLEADING: Issue, Proof and Variance—Admission of Evidence on Material Allegations Ambiguously Admitted.** Evidence is ad-

missible on a material allegation of the petition, so long as such allegation is not met with an admission fully as broad as the allegation itself. And an ambiguous answer will be construed against the pleader.

PRINCIPLE APPLIED: Plaintiff alleged (a) that, by reason of the negligence of the employees of the defendant, one of its trains crashed into the rear of the train on which plaintiff was a passenger; (b) that he (plaintiff) received numerous specifically described injuries; (c) that his injuries were permanent; (d) that he suffered a grave nervous shock and great bodily pain and mental anguish. Defendant admitted (a) the negligence of its employees, and (b) that defendant is liable for the actual damages, but denied (c) that ''plaintiff was injured in the manner, nature or extent claimed.'' *Held*, oral evidence and photographs were properly received to prove the *manner, circumstances* and *incidents* of the wreck.

EVIDENCE: Photographs—Admissibility—Illustration in Aid of Oral Testimony. The admissibility of photographs is almost wholly a matter of discretion with the trial court, and emphatically is this true when they are intended to perform the office of an illustration in aid of oral or written testimony, rather than as being in themselves independent evidence. So held in a personal injury action growing out of a railway wreck.

EVIDENCE: Photographs—Identification and Accuracy—Sufficiency of Showing. The sufficiency of the identification and showing of accuracy of photographs rests almost wholly with the trial court— a discretion non-reviewable except in a clear case of abuse of discretion. Evidence reviewed, and held sufficient to justify the reception in evidence of certain photographs of a wreck, even though no witness specifically stated that they were correct, and of certain X-ray pictures of an injured leg, even though no witness specifically stated that they were a correct representation of the leg.

EVIDENCE: Res Gestae—Expressions Indicating State of Mind— Mental Anguish. Whenever it is material to prove the state of a person's mind, or what was passing in his mind, then *what he said* may be original and competent evidence. So held as to what an injured person said indicating the depressed and discouraged state of his mind.

PRINCIPLE APPLIED: Plaintiff suffered severe injuries in a wreck in which other persons lost their lives. In an action for damages, his mental anguish and suffering were an issue. While suffering great physical pain, he expressed a wish (a) ''that he might have gone with the other two;'' (b) ''that he might not be

left to suffer what he did and was afraid he might lose his limbs if he did get well,'' and said (c) ''that he didn't think he could get well and that it would have been better had he died with the rest.'' *Held*, properly received on the question of mental anguish.

**EVIDENCE: Opinion Evidence—Permanency of Injuries.** Whether certain personal injuries are permanent or otherwise is very properly a subject for expert testimony, especially where the expert, a physician, has personal knowledge of the injuries and their condition.

**EVIDENCE: Opinion Evidence—Nervous Shock—Expert Opinion.** Whether or not a person caught in a railway wreck was liable to sustain a great nervous shock is a proper question for expert opinion, the injured person having seen the impending collision shortly before it occurred and being unable to escape.

**DAMAGES: Measure of—Injuries to Person—''Present Worth''— Instruction—Sufficiency.** Omission to specifically instruct that, in assessing damages for *future* pain and suffering and for loss of *future* earnings, the jury must be confined to the *present worth* of the sum so found, is not error when the instruction given *does not inhibit* the computation of damages on the basis of present worth.

**TRIAL: Instructions—Form, Requisites and Sufficiency—Correct But Not Explicit—Entering Exceptions—Waiver.** If an instruction is correct, as far as it goes, though not as explicit or limited as desired, request must be made for the more explicit or limited instruction, or the right thereto, if it exists, will be waived; and this rule is not obviated *by taking an exception to the instruction given*. So held where instructions, otherwise correct, were inexplicit as to the *present worth* of damages for loss of future earnings, etc.

**DAMAGES: Pleading—Personal Injury—''Decreased Earning Capacity''—Sufficiency of Allegation.** Language is only a vehicle with which to convey thought. *Held*, ''decreased earning capacity'' was sufficiently alleged by a pleading that charged that plaintiff (a) ''will continue to suffer great bodily and mental anguish during his lifetime,'' (b) ''was maimed, bruised and wounded,'' (c) ''is now a cripple, not having any use of his left leg, and his right leg is weak and quickly gives out'' and (d) ''is suffering from injuries that are permanent.''

**TRIAL: Verdict—Excessiveness—$14,000.** Verdict of $19,000 for personal injuries, reduced by trial court to $14,000, sustained. Plaintiff, a farmer, was 20 years of age when injured, and then had a life expectancy of 41 years. The right leg was fractured and dislocated. The left leg suffered a double compound fracture of the

tibia and fibula. Some of the bones protruded through the flesh. Heel of left foot was bruised. The face was cut and bruised in numerous places—in fact, "bruises all over the body." Condition was so grave that no attempt was made to reduce the fracture for four days. Repeated operations and wiring of the bones failed to bring about a union of the broken bones. Severe and long-continued infection resulted. The union finally obtained was imperfect. The left leg is permanently stiff and crooked. Great physical and mental suffering necessarily resulted. At time of injury, plaintiff was managing a farm of 680 acres and his services therefor were worth $1,000 per year.

*Appeal from Franklin District Court.*—C. G. LEE, Judge.

FRIDAY, DECEMBER 17, 1915.

REHEARING DENIED TUESDAY, MAY 2, 1916.

ACTION at law to recover damages on account of personal injury. Verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*C. H. E. Boardman, W. H. Bremner* and *F. M. Miner,* for appellant.

*E. P. Andrews,* for appellee.

WEAVER, J.—On March 2, 1913, the plaintiff, a young man of 20 years of age, loaded a car of cattle at Sheffield, Iowa, for shipment over defendant's line of railway to Chicago, Illinois. Plaintiff accompanied the shipment, taking passage upon the caboose or way car attached to the freight train. Arriving at Steamboat Rock, a station upon the defendant's road in Hardin County, the train was stopped and the engine detached therefrom for some purpose, leaving the train standing upon the main line. While waiting thus for the return of the engine, another freight train following upon the main track came from the north at a high rate of speed and crashed with great violence into the rear of the standing train, occasioning a very serious wreck, destroying the way car, killing two of its occupants and inflicting very serious injuries upon

plaintiff.   After alleging these matters, the petition states further that plaintiff was cut, maimed, bruised and wounded about the head, arms, legs and body; that the right leg was broken at or near the ankle joint; that he suffered a compound fracture of the bones of the left leg; that one of his fingers was broken; that he was cut about the head and scalp and on his chin and cheeks; was bruised on his arms and back, and received a violent shock to his nervous system, causing him to suffer great physical pain and mental anguish, which effect will continue for his lifetime.   He further says that his injuries are permanent and have made him a cripple, without having any use of his left leg, while the right leg is weak and gives out after a few hours' use.   He charges that the wreck and his consequent injuries were caused by the negligence of defendant in several respects, which, for reasons hereinafter shown, require no particular statement.   Upon the showing thus made, he demands a recovery of damages in the sum of $30,000.

The defendant, answering, admits that plaintiff was injured while a passenger upon its train, admits that such injury was occasioned by the negligence of its employes and that it is liable to the plaintiff for damages so sustained, but denies that his injuries are as serious or the resulting damages as great as stated in the petition.   In an amendment filed at the time of the trial, defendant "denies that plaintiff was injured in the manner, nature and extent claimed in the petition."

From this statement of the issues, it will be seen that the dispute between the parties turned solely upon the nature and extent of plaintiff's injuries, and the amount of damages he was entitled to recover.   These questions having been submitted to the jury upon the evidence and the charge of the court, a verdict was returned assessing the damages at $19,000.   Thereafter, the court, holding that the amount was excessive, gave the plaintiff the option to remit $5,000 from

the amount of the verdict and accept judgment in the sum of $14,000, and, this condition being complied with, defendant's motion for new trial was overruled and judgment entered.

We have, then, to consider whether the record shows any reversible error necessitating a new trial. Appellant's counsel at the outset concede that they find it difficult to designate "individual and specific errors" which one may say influenced or misled the jury into returning a large verdict, but they attribute such result rather to the cumulative effect of all the mistakes and adverse rulings of the court below. Following as well as we can the specific complaints mentioned in the argument, they are as follows:

I. Plaintiff's petition as drawn, and as it stood at the close of the evidence, did not allege in so many words that his injuries were permanent, and he was then allowed to amend his petition by adding such allegation. This ruling is excepted to by appellant as an abuse of discretion by the trial court. There are sufficient reasons why the exception cannot be sustained. In the first place, the practice of allowing amendments to conform the issues to the evidence is one for which there is not only statutory authority, but the authority of a large and familiar line of precedents. In the next place, we are not at all convinced that it needed any amendment to the petition to permit the introduction of the evidence or to allow the jury to find the injuries permanent and return a verdict accordingly.

1. PLEADING: amendment: conforming issues to facts proved: discretion of court.

II. In empaneling the jury, one H. J. Pals was called into the box, who, upon his examination, stated that he was a neighbor and friend of plaintiff's, and, after going somewhat minutely into the relations between plaintiff and juror and into his present feelings and opinions, the appellant challenged him for cause, and, the challenge being overruled, then challenged him peremptorily, and the juror

2. JURY: challenges: overruling challenge for cause: exclusion on peremptory: effect.

did not sit upon the trial. Error is assigned for the alleged reason that the action of the court compelled appellant to use his last peremptory challenge in order to remove the juror from the panel.

No rule of the kind contended for has ever been recognized by this court, and we think it equally unknown to courts in general. The statute provides for each litigant five peremptory challenges. This number the legislature apparently deemed sufficient to protect the average party in his right to an impartial jury; for, after having removed all jurors against whom he can show cause for challenge, he is still permitted to exercise five additional challenges without cause, and these he may use in removing any of the twelve first drawn into the box, or in removing any of those who may be called in later to fill vacancies. It may be wise strategy for counsel to keep one of his challenges in reserve as long as he can, because of the possibility that a juror may yet be drawn whom he regards as more undesirable than any of those in the box, and the reserved challenge may be useful in removing him; but this is a matter upon which each party must take his chances. So, also, if a challenge for cause which ought to be sustained is erroneously overruled, there is no prejudice to the challenger if he still has the opportunity to get rid of the objectionable juror by peremptory challenge. This has so often been held by the courts as not to be open to debate. It follows of necessity that, where the party has the opportunity to exclude the juror by peremptory challenge, and does in fact so remove him, the overruling of the challenge for cause will afford no ground for reversal of the judgment finally rendered. See *State v. Foster*, 136 Iowa 527, and cases there cited. The case before us is, in all respects, within both the spirit and the letter of the established rule, and defendant is without legal ground for complaint.

III. The plaintiff was allowed to prove the manner, circumstances and incidents of the wreck in which he was

injured.   In so doing, photographs of the wrecked train and its surroundings were identified and put in evidence.   To this, defendant has excepted, for the reason that the answer admits liability, and the evidence so admitted has no tendency to prove the nature or extent of plaintiff's injuries, or the amount of compensation to which he is entitled.

3. PLEADING: issue, proof and variance: admission of evidence on material allegations ambiguously admitted.

It is true that defendant's answer, as originally filed, did admit that, ''by reason of the lack of care of its employes, plaintiff was injured while a passenger on its train on March 4, 1913, and that defendant is liable for the actual damages,'' but, even if the answer had been left wholly unchanged by subsequent amendment, we are of the opinion that it would not deprive plaintiff of the right to go, to a reasonable extent, into the details of his injuries and the manner and circumstances of their infliction.   The admission made in the answer, it must be observed, is by no means as broad as the charge made in the pleadings.   It concedes the defendant's negligence and that defendant is liable in damages in some uncertain or indefinite amount, but leaves upon plaintiff the burden of proving every other element of his case. He claims to have received a large number of specifically mentioned injuries and to have suffered nervous shock and injury of a grave and permanent nature, and that therefrom he has been made to endure great bodily pain and mental anguish.   None of these things were admitted, and it cannot be doubted that plaintiff was entitled to offer evidence to the jury upon all these matters.   Moreover, for the purposes of this appeal, we must further look to the issues as affected by the amendment to the answer, which denies that ''plaintiff was injured in the manner, nature and extent claimed'' by him. This denial is somewhat ambiguous, in that it is not clear whether the words ''in the manner'' are to be construed as referring to the manner in which the injuries were occa-

sioned, or the manner in which the injuries have affected the plaintiff's physical condition. The former would seem to be the most natural construction, though defendant, in argument upon this appeal, maintains the attitude of admitting plaintiff's claim in all respects except the extent and gravity of his injury and the amount of his damages. At the very best, the admissions, as made in the answer as amended, are so limited by its denials that the court did not err in allowing plaintiff to prove the fact as to his injuries and to the manner in which they were received. We should also say that, even if the answer should be treated as raising no issue except the extent of plaintiff's injury and the amount of his recovery, we see no reason for holding that proof of the manner and circumstances of such injury should not have been admitted. The defendant (as it had the right to do) sought to minimize the seriousness of plaintiff's bruises and wounds. On the other hand, plaintiff sought to show (as he rightfully might do if such were the fact) that these injuries were of such extensive and grave character as might naturally have been expected from being involved in a wreck characterized by great violence and by the crushing of the car in which he was entrapped. These things afford circumstantial evidence bearing upon the probability of the truth of the matter in dispute. Again, mental shock and suffering accompanying the injury afford grounds of recovery, and this cannot be adequately presented to or appreciated by the jury except by showing the plaintiff's experience at the time and place of the accident.

Particular complaint is made of the use of photographs offered by the plaintiff. In the first place, it is urged that the photographs were not properly identified as correct representations, and, in the second place, that they should have been excluded on the ground assigned by defendant for the exclusion of all evidence bearing upon the facts and circumstances of the wreck of the train. As to the latter objection, what we have already said in this paragraph

4. EVIDENCE: photographs: admissibility: illustration in aid of oral testimony.

sufficiently indicates the reason why it cannot be sustained. It is further to be said that the photographs were not offered or used as independent or original evidence, but rather as mere illustrations in aid of oral evidence given by witnesses who were on the ground.   Whether photographs are to be admitted or excluded is a question very largely, if not entirely, in the discretion of the court, and this is more emphatically the case where, as we have said, they are intended to perform the office of an illustration or diagram in aid of oral or written testimony, rather than as being, in themselves, independent evidence. *Faivre v. Manderschied,* 117 Iowa 724, 732; *Nolte v. Chicago, R. I. & P. R. Co.,* 165 Iowa 721, and cases there cited.  See also *Cubbage v. Youngerman,* 155 Iowa 39, 49.

As to the sufficiency of the identification, we see no ground for valid objection.   The sufficiency of the showing was a preliminary question for the court to pass upon when the photographs were offered, and the holding will

5. EVIDENCE: photographs : identification and accuracy : sufficiency of showing.

not be interfered with except in clear case of abuse of discretion.   *Van Houten v. Morse,* 162 Mass. 414; *Jameson v. Weld,* 93 Me. 345; *Dolan v. Mutual R. F. L. Assn.,* 173 Mass. 197; *Harris v. City of Ansonia,* 73 Conn. 359; *Pritchard v. Austin,* 69 N. H. 367; *Nolte v. Chicago, R. I. & P. R. Co.,* supra. The pictures were identified both by the persons taking them and by one or more witnesses present at the time they were taken, one of the witnesses having also seen the collision take place.   The artist taking the pictures says they are photographs taken by himself.   Another who was present says he recognizes the photographs shown him as "pictures of the wreck mentioned."   It is true, as defendant objects, that no witness testifies in so many words that the pictures are correct, nor was that question specifically asked; but the reasonable inference from the language employed is that the photographs fairly represent the situation as the witnesses saw it.   Altogether, while the identification could have been made more specific, there is no such lack of evidence upon the subject

that we can say that the court abused its discretion in admitting the photographs in evidence. Some weight, we think, should also be allowed to the matter of common knowledge that a photograph taken in the usual manner produces a picture of the object or scene to which the camera is directed, with sufficient fidelity to materially aid the court or jury in understanding and applying the testimony of witnesses who speak with reference thereto. There was in this case no attempt to show that the photographs were not in fact faithful pictures of the scenes so illustrated.

In this connection, we may also consider defendant's objections to the skiagraphs of plaintiff's injured leg, introduced in evidence. The evidence of physicians and surgeons tended to show that, at various times between the date of the injury and the time of the trial below, skiagraphs, or pictures obtained by the so-called X-ray process, of the plaintiff's broken legs were taken, and these were identified both by the surgeon taking them and by other surgeons present on these occasions. Some of the later pictures were from plates taken with the assistance or in the presence of the surgeons employed by and testifying for the defendant. One of the surgeons employed by the defendant, one who treated the plaintiff several months, testified to having himself taken several skiagraphs of the broken limbs at different times and said they were present in court; but the record does not seem to indicate that they were put in evidence, nor do defendant's expert witnesses, or any of them, deny or question the accuracy of the skiagraphs offered by the plaintiff. The objection urged by counsel is practically the same as was made against the photographs of the wreck, that is, that there is no sufficient identification or showing that they are correct representations of the plaintiff's legs at the time they were taken. In one sense of the word, no such identification is possible. A skiagraph is a picture of a state or condition of things which is not visible to the naked eye, and its correctness is, at best, a conclusion. Owing to its novelty, the courts were, for a time, somewhat

slow to admit a skiagraph in evidence except upon quite minute preliminary proof of its scientific accuracy, but its use has become so common and the general correctness of its representations has been so fully proved by investigation that the present rule as to photographs, diagrams, maps and other illustrative evidence is now very generally extended to pictures obtained by the use of the Röntgen ray. That a wide margin of discretion in reference to the sufficiency of the preliminary showing is reposed in the trial court is well illustrated in the case of *Kimball v. Northern Electric Co.*, decided by the California court in 113 Pacific 156. There the court, considering the same objection that is here made, says:

"While it would have been better, no doubt, to have introduced evidence of the familiarity of the physicians with the process of X-ray photography and the methods employed in preparing these particular exhibits, we cannot see that the omission so to do amounted to error necessitating the reversal of the cause. The witnesses were qualified surgeons. It is well known that the X-ray is almost universally understood and used by surgeons of the present day in examining injuries. Doubtless the court required less preliminary proof from such witnesses than would have been exacted from laymen. The surgeons had testified without objection that they had examined the injuries themselves by the use of the X-ray apparatus, and this testimony in itself was an indication that they were familiar with the uses of the Röntgen rays. When, therefore, they testified to taking certain X-ray pictures, or rather the making of plates, the court doubtless assumed that the ordinary methods of those familiar with such matters had been followed. . . . But, even if an error were committed in the admission of the testimony . . ., it was harmless, for it is evident that the condition shown by the photographs did not differ from the circumstances disclosed by the testimony of the physicians based upon their own observations. A photograph is used like any other chart, for illustrative purposes."

To much the same effect are *Carlson v. Benton* (Neb.),

92 N. W. 600, and *Prescott & N. W. R. Co. v. Franks* (Ark.), 163 S. W. 180. That pictures of this kind are admitted in evidence as illustrative rather than as independent evidence, see also *Smith v. Grant*, 29 Chicago Legal News 145. The record in this case satisfactorily shows the competent character of the skiagraphs, and the assignment of error thereon is not sustained.

V. Several witnesses, the nurse and members of plaintiff's family, testified to the condition of the plaintiff while in the hospital, and, over the objection of defendant, were permitted to say, after describing his battered and broken condition, that he expressed the wish "that he might have gone with the other two;" "that he might not be left to suffer what he did and was afraid he would lose his limbs if he did get well;" "didn't think he could get well and that it would have been better had he died with the rest." This evidence is said to be clearly incompetent, and that its only purpose was to excite prejudice against defendant in the minds of the jurors.

6. EVIDENCE: *res gestae*: expressions indicating state of mind: mental anguish.

We are of the view that the testimony was competent for its bearing upon the question of the plaintiff's alleged mental suffering. It would be only natural that a person suffering the effects of great bodily injuries and facing the possibility of death, or of life in a badly crippled condition, should suffer extreme mental depression, and we see no reason why the expression of that feeling in words spoken while yet racked by physical pain, and before there is reason to believe that he is malingering or is manufacturing evidence by which to enhance his claim for damages, should not be admissible equally with his expressions of present physical pain, the admissibility of which is not open to doubt. *Keyes v. City of Cedar Falls*, 107 Iowa 509; *Battis v. Chicago, R. I. & P. R. Co.*, 124 Iowa 623, 624; *Yeager v. Incorporated Town of Spirit Lake*, 115 Iowa 593, 596; *Duffey v. Consolidated Block Coal Co.*, 147 Iowa 225, 230.

VI.  Dr. Collins, who treated the plaintiff after he left the hospital, testified to the condition in which he found his patient and the history of the case thence to the time of the trial, and was then asked to state to the jury "in what way the present condition of the leg will affect its permanent use." The objection was overruled, and the witness said:

7. EVIDENCE: opinion evidence: permanency of injuries.

"It will never be a good leg. He will never be able to walk normally. What I mean is he will never have good use of it—a stiff leg. The muscles themselves are not toned up as they ought to be. They are all glutiny, stuck together, adhesions, in other words it is a fibrous union."

Very clearly, the objection that this is an invasion of the province of the jury is not well taken.  See *Manton v. Stevens,* 170 Iowa 495, 508.  If plaintiff's leg had been amputated, or if he was crippled in some other manner which made it perfectly plain to the eyes of the jury that the disability was permanent, it would need no testimony, expert or otherwise, to prove that fact.  But there was no amputation; and although it may have been plain to the ordinary observer that he was still, to a greater or less degree, physically crippled, its continuance, whether likely to be for life or for a period of years or months, was a question for expert opinion, and the testimony of Dr. Collins was, therefore, both material and competent.  *Vohs v. Shorthill,* 130 Iowa 538, 542.

Other physicians were asked as to the probable effect upon a person caught in a car in the manner described by plaintiff, seeing the oncoming train about to collide with the car and being unable to escape, and being then involved in the crash, resulting in great bodily injury.  The answer thus elicited was, in substance, that a person passing through that experience would probably sustain a great nervous shock. The objection to this testimony is of the same character as that which counsel raise to the testimony of Dr. Collins, and for like reasons we hold that the objection was properly

8. EVIDENCE: opinion evidence: nervous shock: expert opinion.

overruled.   The petition alleges nervous shock, as well as other injuries; and, as that allegation is not admitted, this evidence has a legitimate bearing on the issue so presented.

VII.   The court, speaking of the measure of. damages, said to the jury: "It was such sum as in your fair and impartial judgment, it is shown, by a preponderance of the evidence, will fairly and fully compensate him, in dollars and cents, for the injuries resulting to his person, and for the physical and mental pain and suffering endured by him, if any, and for such pain and suffering as it is reasonably certain will be endured by him in the future, if any, resulting therefrom.   In considering injuries to the person, you should consider whether or not such injuries are permanent or otherwise and the effect, if any, they have had upon his earning capacity since reaching his majority, and whether it is reasonably certain the same will have any effect upon his earning capacity since reaching his majority, and whether it is reasonably certain the same will have any effect upon his earning capacity in the future and if so to what extent, and you will also consider the inconvenience, if any, which has resulted therefrom or which it is reasonably certain will result therefrom in the future."

9. DAMAGES: measure of: injuries to person: "present worth;" instruction: sufficiency.

The defendant requested the court to give certain other instructions bearing upon the issues being tried, but did not request any other or additional instruction upon the measure of damages.   It did, however, file an objection to the instruction so given, on the ground, among other things, that the jury was not limited in assessing the damages to the present value of the sum so found, and we are asked to reverse the judgment because of the alleged error in failing so to charge.

The instruction in the form given does not inhibit or negative a computation of damages on the basis of present worth, and we cannot assume that the jury did not, in fact, so reach its determination.   Such, indeed, would naturally be the course of intelligent jurors in estimating a sum which

would "fully and fairly compensate" the plaintiff for the wrong done him. As was well said in the *Greenway* case, speaking of an instruction like the one given in this case, "It may well be assumed that the jurors appreciated without explicit explanation that they were to estimate the present value of future earnings lost to the injured person."

Being correct then, as far as it goes, it was incumbent upon defendant, if it wished a more explicit statement, to request an instruction in accordance with its theory of the law. In its requests for instructions, nothing of this kind is asked, and we think that defendant is not in position to insist that the court should have charged the jury otherwise than it did on this subject. The taking of an exception to an instruction was not, in our judgment, the equivalent of a request to the court to give a specific instruction which the party believed stated the better rule of law. *Greenway v. Taylor County*, 144 Iowa 332, 341; *Clark v. City of Cedar Rapids*, 129 Iowa 358, 362; *Breen v. Iowa Cent. R. Co.*, 159 Iowa 537; *Woodworth v. Iowa Cent. R. Co.*, 170 Iowa 697.

10. Trial: instructions: correct but not explicit: entering exceptions: waiver.

VIII. As will be noted from the instruction above quoted, the court permitted the jury to consider, in estimating plaintiff's damage, the extent, if any, to which his earning capacity had been impaired by his injury from the time he reached his majority, and whether it had been shown with reasonable certainty that his earning capacity in the future had been so impaired. Counsel except to the instruction at this point, because, as they insist, the petition makes no claim for decreased earning capacity in the future, and because damages of that nature are remote and speculative. This objection counsel reinforce by the statement that, at the time of the trial, plaintiff was yet a minor. The record does not bear out the exception. It appears, in the abstract prepared by appellant, that plaintiff had arrived at his majority after the suit was brought, but before

11. Damages: pleading: personal injury: "decreased earning capacity:" sufficiency of allegation.

the trial. In the next place, the petition specifically alleges plaintiff's decreased earning capacity when it states that he "will continue to suffer great bodily pain and mental anguish during his lifetime;" that he was "maimed, wounded and bruised;" that he "is now a cripple, not having any use of his left leg and his right leg is weak and gives out after being used a few hours;" that "the injuries set out in the petition and amendment are permanent; and that he will be a cripple during his lifetime, incapacitated from pursuing his avocation of farming or any avocation requiring him to be on his feet or to use his legs, and that such inability is permanent." True, there is no assertion, in so many words, of "decreased earning capacity;" but, had he made use of such words, it would have been a mere repetition in another form of what he had already said, and would have added nothing to the meaning or effect of the pleading as it reads. The mere statement of the pleadings demonstrates the unsoundness of the objection and obviates the necessity of further discussion thereof.

IX. The final insistence of appellant is that the verdict is excessive. The statement of counsel that the question here raised is whether the plaintiff "can recover $14,000 for a stiff ankle—50 per cent. efficient," is neither accurate nor fair. The evidence offered by plaintiff is without substantial contradiction, except, perhaps, in the varying opinions of the expert witnesses concerning his probable future physical condition. The physician first reaching the plaintiff at or near the scene of the wreck describes his condition at that time as follows:

12. TRIAL: verdict: excessiveness: $14,000.

"I saw the plaintiff in this case about the time he was injured; I should think within 15 or 20 minutes, possibly, after his injury. He had been removed to the house, about a block from where the accident took place, and there was a Pott's fracture with a complete dislocation of the right leg, and the left leg there was a double compound fracture of the tibia and fibula, near the junction of the lower third, and

heel of the left foot was bruised, and on his face there was signs, dirt ground in, in fact all over the face, the chin was cut and there was a cut on the forehead, just back of the hair, the hair had to be shaven off in order to dress it. His face was bruised and there were bruises all over his body, blood all over his face from this cut on the head and chin, as I remember. As to whether any of the broken bones had protruded through the flesh, that was the compound fracture on the left leg, the bones had been through the flesh, of course, when I saw it they had lifted him up and they had pulled back into the flesh, you could see the edge of the bones sticking up right at the edge of the fracture."

The injured man was removed at once to the hospital at Eldora kept by the defendant's local surgeon, who, as a witness for the defense, says that plaintiff was then suffering from shock, that his wounds and injuries had been partly cleaned and dressed, and that proper care and attention were promptly given. For reasons which he deemed to require it, no attempt was made to reduce the compound fracture of the left leg until March 8th, four days later, when, with the assistance of two other doctors, he attempted to get the bones in proper position; but the attempt was unsuccessful, for reasons which he states as follows:

"There was an injury and cut on the heel directly through almost the center of the heel on the lame foot, cut it right down here, and made it impossible for the porous splint on the back of the limb, it was impossible to put it on; for a splint of that character becomes very hardened and too much pressure on the heel. Then the combined fracture occurred about three inches above the ankle joint, so that distance of three inches did not give us sufficient space to put on the ordinary adhesive plaster to make any extension so that when we reduced the fracture and got it directly in apposition, which we could hardly tell because the wound was open. We found after 24 hours that the muscles of the leg had contracted so as to draw that fracture back; in other words it

was almost where it was in the first place. The company's surgeon was notified of the condition of the fracture so he came up on the 12th of March, and we took a second skiagraph, after Dr. J. W. and Dr. Willard Caldwell and myself attempted to reduce the fracture, we took a second skiagraph. Then on March 12th Dr. Nichols came in response to our call and the four of us, Dr. J. W. and Dr. Willard Caldwell, Dr. Nichols and myself, then placed him under ether and made an attempt to reduce the fracture and hold it in proper position. I spoke of the two Dr. Caldwells, I referred to the doctor that was here on the witness stand—he is the younger doctor—and his father. I used the term apposition; that means holding the bones in exactly the position they should be in, end to end would be proper position. After Dr. Nichols got up there, with me and Dr. Nichols and all the other doctors, then we made a second attempt to adjust the fracture and hold it in apposition. Then after we attempted to treat it in this way, the next thing done was that on March 18th we took another skiagraph and found that the bones had pulled out of place again, and on March 19th Dr. J. W. Caldwell and the younger Dr. Caldwell and myself made the third attempt to pull the bones in proper position and to hold them there, we then put on a different method of extension, a method that is commonly used and accepted for that purpose with an attempt then to contract or hold the bones down in their proper place. That did not hold them. Then on March 24th we took another skiagraph and it still showed there was not sufficient power on the apparatus we used to hold the bones down; then I notified Dr. Nichols again and he came up there and Dr. Nichols and myself and the younger Dr. Caldwell then wired those bones together. I say we wired them together. I mean by that—there are several ways we have to repair in relation to these bones, that is the Lane's plate, the use of ordinary spikes, and the wiring. We then chiseled off a piece of the shin bone about two or three inches."

Thereafter, says the doctor:

"In spite of our care infection occurred.  From that time there was sloughing, little pus pockets would form and make their appearance and we would have to open and drain them. . . . He got better very slowly, the healing of the bones went on very well until the latter part of June—he had a very fair union at that time.  About this time the leg was put into a plaster cast having openings or windows through which to treat the open sores.  On July 3d plaintiff was allowed to go home.  From the time of his injury he was unable to sit in a chair until the first of May.  When he went home he was able to sit up and to bear his weight on the right leg.''

After leaving the hospital, he was treated by Dr. Collins, a physician nearer his home.  This physician testifies that plaintiff came to him on the day following his last visit to the hospital; the foot was very badly swollen and paining him, and the holes were discharging pus.  Witness took off the plaster cast and found "the thing loose, had not been united, had been wired with wires.  He could move the limb but there was not any union between the bones to speak of.'' With the assistance of another doctor, the leg was dressed and put in splints.  A month later, another examination showed the wires still there and loose, then the witness returned with plaintiff to the hospital, where the wires were taken out.  Thereafter, the witness says he dressed the leg every day or two, but that, when the opening would get nearly healed up, it would fill up again.  In these treatments, several pieces of bone were taken out, and another piece of wire was discovered and removed.  There was infection.  At the time of the trial, plaintiff was still unable to use his leg; the wound therein was still unhealed; and, according to the witness, the bones are not in correct position with reference to each other; the leg is crooked and the joint has not correct articulation; and, in the opinion of the physician, he can never regain the normal use of the limb.  This opinion is corroborated by other physicians who examined the case.

From the testimony of plaintiff himself, as well as of the nurses and members of his family who attended him, it is very clearly shown that he suffered great pain both of body and mind, and the evidence is sufficient to sustain a finding that the injuries received by him are in many respects permanent. When injured, plaintiff was a young man just arriving at his majority. He was a farmer's son, with the education usually acquired in the common school, and he expected to remain a farmer. His mother owned about 1,300 acres of land, of which plaintiff was managing or operating 680 acres, upon which was a large amount of live stock and other personal property, and there is evidence tending to show that his services in that capacity were worth $1,000 per year. His expectancy of life, as shown by the tables in evidence, was about 41 years. It is very evident that, if plaintiff is entitled to recover anything, and it is admitted that he is, the injury and loss for which he is to be compensated are very much more than a "partially stiffened ankle." The jury could very properly find that his efficiency and capacity for earning money and for performing the duties of the life, occupation and station in which he had been born and reared were very materially and permanently impaired; that he had suffered extreme bodily pain and agony through a period of many months; and that such handicap to usefulness and peace of mind was quite certain to extend far into the future, if not to the end of his life. The trial court reduced the damages assessed, by the sum of $5,000, and in so doing went as far in that direction as was reasonably justified by the record. At least, the verdict, as so modified and as it passed the scrutiny and revision of the trial court, which had the plaintiff and the witnesses before it, is not so extravagant that we are at liberty to interfere with it.

There is no error shown calling for a reversal of the judgment entered below and it is—*Affirmed.*

EVANS, C. J., DEEMER and PRESTON, JJ., concur.