PETE KRAMER, Appellee, v. RANDALL HENELY et al., Appellants.

No. 44925.

NOVEMBER 21, 1939.

REHEARING DENIED MARCH 9, 1940.

V. A. Mettler and Uhlenhopp & Uhlenhopp, for appellee.

Birdsall, Archerd & McGrath and Putnam, Putnam, Fillmore & Putnam, for appellants.

STIGER, J.—In August, 1936, plaintiff was engaged in truck farming on his 160-acre farm near Northwood, Iowa, marketing the produce in various cities in Iowa. Alvin Toombs was an employee of plaintiff. About 9 o'clock on the evening of August 13, 1936, plaintiff and Toombs left the farm for Des Moines with a load of cabbage. About 2 o'clock the next morning when they were driving west on primary road No. 20, the left rear tire of the truck was punctured and they stopped to change tires. While they were so engaged, an automobile driven by defendant Randall Henely, and owned by defendant A. J. Henely, approaching from the east, struck the rear of plaintiff's truck causing the injuries to plaintiff and his property for which he seeks damages.

I. Plaintiff offered in evidence three X-ray pictures, or skiagraphs, taken by Dr. J. R. Shaffer, identified as Exhibits A, B, and C. Dr. Shaffer, a witness for plaintiff, is an osteopathic physician and surgeon of Mason City. He graduated from Des Moines Still School of Osteopathy and later taught in that school for 4 years. He practiced his profession in Des Moines for 4 years and at the time of the trial had charge of the surgery and X-ray department in the North Iowa General Hospital at Mason City.

Appellants objected to exhibits because no proper foundation was laid and they were incompetent and immaterial. Appellants' first proposition is that the court erred in overruling their objections to the exhibits.

Dr. Shaffer, in identifying the exhibits, stated they were pictures of Mr. Kramer which he took at the hospital on October 15, 1938.

Appellants present their contention on this issue in the following language:

"There was absolutely no qualification laid that the said exhibits correctly and accurately represented the condition of plaintiff's back or spine within the scope of the pictures at the time the photographs were taken. Dr. Shaffer nowhere said that such pictures correctly reflected the condition of specific portions of the plaintiff's body. No foundation was laid connecting the plaintiff's condition as of the time the photographs were taken with his condition following the accident."

It is self-evident that the physician could not state that the pictures were true representations of the objects beneath the surface of the body they purported to portray. X-ray photographs are generally recognized as scientific, trustworthy representations. Dr. Shaffer, who was experienced and skilled in the use of X-ray instruments, took the pictures, explained the position of the patient when the pictures were taken and his testimony clearly shows what portions of the body of the plaintiff are represented by the skiagraphs.

We are of the opinion that there was sufficient foundation for the introduction of the pictures. Prior to making the skiagraphs, Dr. Shaffer made a physical examination of Kramer and testified in detail to the conditions he found in his back, spine and abdomen. The exhibits were then introduced. The witness

then explained to the jury how the exhibits were taken and pointed out on the exhibits and explained the conditions he found on his personal examination of the patient. ·The exhibits were principally used as illustrative of the oral testimony of the physician. Whether a proper foundation was laid for the introduction of the exhibits was largely in the discretion of the trial court. See Ingebretsen v. M. & St. L. R. Co., 176 Iowa 74, 155 N. W. 327; Wosoba v. Kenyon, 215 Iowa 226, 243 N. W. 569; State v. Matheson, 130 Iowa, page 440, 103 N. W. 137, 114 Am. St. Rep. 427, 8 Ann. Cas. 430.

·In Kimball v. Northern Electric Co., 159 Cal. 225, 113 P. 156, 159, which is quoted with approval in the case of Ingebretsen v. M. & St. L. R. Co., supra [176 Iowa 74, 85], it is stated:

" 'The witnesses were qualified surgeons. It is well known that the X-ray is almost universally understood and used by surgeons of the present day in examining injuries. Doubtless the court required less preliminary proof from such witnesses than would have been exacted from laymen. * * * When, therefore, they testified to taking certain X-ray pictures, or rather the making of plates, the court doubtless assumed that the ordinary methods of those familiar with such matters had been followed.' "

The admission of the exhibits was well within the discretion of the trial court.

There is no merit in appellants' claim that plaintiff did not connect his condition at the time the pictures were taken with his condition following the accident. The transcript discloses evidence that the injuries and conditions shown by the exhibits and the testimony of Dr. Shaffer had their origin in the accident.

■  II.  Another error relied on for reversal is that the court erred in giving instruction No. 11, the material part of which reads:

"He also asks the further sum of $2,000 for future and anticipated medical expenses and hospital bills which he claims he will have to incur because of his injuries; and if you find him entitled to anything on this item, you should allow him such an amount, and such an amount only, as the evidence shows to a reasonable certainty he will reasonably and properly incur in the future for such medical services, reduced to its present worth."

Appellants claim there was no competent evidence to support the instruction which permitted the jury to enter the field of speculation and conjecture and return an excessive verdict. We do not agree with appellants. The plaintiff, in his petition, asked for damages in the sum of $2,000 for future nurse, medical and hospital bills. His evidence shows that he received severe, permanent injuries to his back and spine and suffered intense pain. After the collision, the truck was 100 feet north of the place it was struck by appellants' automobile. The following appears from plaintiff's evidence:

Plaintiff was dragged west under the truck about 30 feet. After the accident he was taken to the town of Williams where his chest, back and face were bandaged and taped. His face was "full of gravel." He was then taken to the hospital in Iowa Falls where he was re-taped and given lockjaw treatment.

Mrs. Kramer testified "after the accident I found him in the hospital in Iowa Falls; he looked terrible—all bandaged up. I had to get him new clothes to take him home, every piece of clothes was torn to pieces; one shoe was lost."

Plaintiff testified with reference to his condition at the hospital as follows:

"I was miserable with pain whenever the doctor touched me. I was cut and bruised all over."

Plaintiff was taken to his home where he stayed in bed several weeks. He continued to suffer pain in his chest and back of his neck. Two hernias are the result of the accident. Because of the hernias and other injuries received, plaintiff testified:

"They keep me from sleeping at night and I can't walk in the daytime. I can't sit down decent in a chair and I can't stand up and I can't walk; it doesn't make any difference what I do or in what position I am in it bothers me always.

"I have not done any work since the injury. I get in the field some afternoons, I walk out there and look over what they are doing. When I try to work I suffer for it for the next 24 hours.

"It seems to me I am getting worse, my condition is getting worse; it bothers me more now than it did a year ago."

Prior to the injury plaintiff was a strong, able-bodied, hard

working man. He was "never laid up for a day." After plaintiff returned home he was attended by Dr. Hansen of Northwood who finally took him to the Park Hospital at Mason City. He also consulted with other doctors but was never able to obtain any appreciable relief.

Mrs. Kramer testified:

"A good many nights I wake up and he will be sitting on the edge of the bed crying and he can't sleep at all, and that condition is true now. He is that way all the time. Before the accident he was the best man for work you ever saw. He was so strong he could do anything. He never had any of that trouble about sleep before the accident. He never complained of trouble in his back or of hernias or anything. Since the accident he complains so about his chest and back. He can't sit down, has to always lean on something, it hurts so, he says, in the back and under his ribs. He is always complaining and that is the reason he can't sleep. He can't lay on his side, it is a pressure on his ribs, the way he always tells me. There isn't an hour of the day that he doesn't have something bothering him. He tries to do a little and he suffers a whole day then."

Dr. Shaffer testified:

"We found on Mr. Kramer that he complained of pain through the chest area and he was unable to sit for any period of time from pain in the low back and hip area, and we found on examination that the patient has restricted motion of the ribs through the lower part of the chest. I mean they are not as freely movable. When he breathes they don't raise up or lower like they do on an ordinary person.

"Then we found on examination a little further that he has a right and left hernia, one on both sides.

"On the lower pelvic back area we find that the pelvis is not exactly straight. We have what we call a sciatic condition on the left side and that is due to the articulating area between the spine and the contour of the pelvic bone.

"Further up on his spine we find tender areas through what we call the medial dorsal area, and that is from the lower edge of the ribs up to the central portion of the back is where you find the change in the curve of the back which causes tenderness on slight pressure going along the back of the spine.

"This is the spinal column, ordinarily it should be a perpendicular line, it should be straight, and you notice that we have a definite curve this side and then one back to this side to accommodate there, here is where Mr. Kramer complains of a portion of his trouble, right through this area, see, here is where part of your curve starts and you will notice the corners of the vertebrae have little projections out here, that isn't normal, they should be straight and clear, you should be able to see directly through and get a clear cut outline, here is the place these corners are very prominent, which we call a lipping of the vertebrae or overgrowth of bone due to some particular thing that has happened to the body.

"This portion right through here is where he complains of the big portion of his pain and that is where you get your outline that is not clear.

"I feel that he has got a permanent injury, I think that he will always have to have some medical attention from now on to keep himself in any condition at all.

"I think it will materially become worse. You can repair the hernias and relieve that portion of his condition at this time, but as far as the spine is concerned, I think that will be a permanent condition.

"He would have to have a major surgical operation to repair the anterior abdominal wall on both sides, and he would have to be confined in the hospital approximately three weeks and then be in bed possibly a couple of weeks, three weeks possibly, it depends on his recovery.

"There is no certainty of complete recovery from the hernias. The expense of the surgical operation for a hernia operation, including hospital bills, would be about $400.00.

"This condition of Mr. Kramer's back that I found will probably get worse as he goes along because there is a definite change, lipping of the vertebrae and that won't decrease, if anything it will increase, the change of the structure. Because of this, his health will not be good from now on owing to this condition of the spine."

The verdict was for $6,500. Plaintiff's life expectancy is 18 years. It is estimated that a hernia operation will cost $400. Assuming the jury allowed plaintiff $2,000 on this item, which is not probable, it is only natural to assume that this unfor-

tunate man will continue to turn to the medical profession in the hope, though possibly futile hope, that in some way he may be given surcease from his disabilities, pain and suffering.

There is no standard available for the measurement of such damages with any precision.

In the case of Rulison v. Victor X-ray Corporation, 207 Iowa 895, 905, 223 N. W. 745, 750, we stated:

"It is urged that there was no basis in the evidence for this instruction, and that the jury was permitted to award the sum solely upon its own judgment. The evidence was that plaintiff's disabilities were probably permanent. There was no evidence on the probable amount of future medical service. In the nature of the case, there could be nothing but an estimate. That some medical expense would be necessary was manifest."

On this record we are unable to say that it is not reasonably certain that plaintiff will incur an expense of $2,000 in future medical, hospital and nurse bills.

III. Another proposition is that the trial court erred in overruling appellants' motion for new trial on the ground that the verdict of $6,500 is excessive and the result of passion and prejudice.

Three physicians testified for defendants. Their testimony was in the main in contradiction to the testimony of Dr. Shaffer and tended to minimize the injuries received by plaintiff. However, one of the doctors testified:

"I wouldn't say that the curvature of the spine might not have something to do with that pain and suffering that he was going through, I wouldn't eliminate that entirely."

Another physician testified:

"I don't mean to go on record here, as saying that a curvature of the spine might not cause a lot of pain and trouble to the patient."

The damage to plaintiff's property was $200. His earnings prior to the accident were around $5 per day and after the accident not over 50 cents per day. His loss of earnings during the 2 years preceding the trial would be over $2,500 and the evidence is that his injuries are permanent and his expectancy is 18 years.

Plaintiff's evidence is replete with testimony of acute pain and suffering prior to the trial and that he will have to endure future pain and suffering.

We cannot say that the verdict was so excessive as to demand a reversal. For a collection of cases involving the question of excessive verdicts, see Engle v. Wilson, 220 Iowa 771, 263 N. W. 505.—Affirmed.

OLIVER, C. J., and HALE, MILLER, MITCHELL, BLISS, and HAMILTON, JJ., concur.