STATE OF HAWAII, Plaintiff-Appellee, *v*. DARLENE JOY TORRES, also known as "Chico", Defendant-Appellant, and BONNIE LYNN HORESES, also known as Bonnie L. Horeses and Bonnie Lynn Rathburn, Defendant

NO. 6144

DECEMBER 28, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, AND MENOR, JJ., AND RETIRED JUSTICE MARUMOTO IN PLACE OF KIDWELL, J., ABSENT

OPINION OF THE COURT BY RICHARDSON, C.J.

Defendant, Darlene Joy Torres (hereinafter appellant), appeals from a conviction for attempted murder in violation of HRS § 705-500 (1976) and HRS § 707-701 (1976). We affirm.

On July 9, 1975, an Oahu grand jury returned a two-count indictment against appellant and one Bonnie Lynn Horeses. The indictment charged appellant with the attempted murder of one Cornel Lucas and charged Horeses with the murder of one Ronald Elesarke. A joint jury trial commenced on January 19, 1976, wherein appellant and Horeses were each represented by separate counsel. From the testimony adduced at trial, the following background was developed.

Both Lucas and Elesarke were shot in a downtown Honolulu hotel during the early morning of July 3, 1975. According to the testimony of Lucas, the surviving victim, Elesarke had been shot and killed with a .38 caliber revolver fired by co-defendant Horeses. Lucas further testified that appellant had wounded him with shots fired from a .22 caliber pistol.

Two weapons were recovered at the scene of the alleged offenses: a .38 caliber revolver which appeared to have been fired three times and a .22 caliber pistol which contained eight live rounds, including one round jammed in the firing position. Although the ammunition holder (clip) of the .22 caliber weapon had the capacity to hold twelve rounds, there was no evidence indicating whether or not the pistol had actually been fired on the morning in question.

During the course of investigation, two .38 caliber projectiles were positively identified as having been fired at the deceased victim from the revolver recovered at the scene. On January 15, 1976, over six months after the shooting incident, a third projectile was recovered from a wall in the room in which the shooting allegedly occurred. However, subsequent ballistics analysis was unable to link this projectile with either the .38 caliber revolver or the .22 caliber pistol. No identifiable .22 caliber projectiles were ever recovered from the scene.

Immediately after the shooting incident, Lucas was taken to a nearby hospital where his injuries were attended to. At

trial, Lucas' treating physician testified that Lucas had probably sustained wounds from three different shots: "One through and through the left arm. One through and through the right hand. And one entered the left abdomen." The bullet that entered his left abdomen did not exit through his body as the other two appeared to have, and x-rays ordered by the treating physician revealed a bullet-shaped object resting near Lucas' spine. An attempt to surgically remove this object was abandoned and it was never positively identified as being fired from either weapon recovered. Upon cross-examination, the treating physician admitted that Lucas' three wounds could have been caused by one bullet instead of three.

During its case-in-chief, the prosecution proferred numerous x-ray photographs purporting to show the object lodged in Lucas' body. Since the prosecution was unable to recover and identify any .22 caliber projectiles from the scene, these x-rays were of critical corroborative value insofar as they tended to prove that Lucas had — as he had testified — in fact been shot by a .22 caliber weapon.

In an attempt to authenticate this evidence the prosecution called the chief x-ray technologist at the hospital where Lucas had been treated. She testified, *inter alia*, that: 1) she was responsible for recordkeeping and supervising x-ray technicians; 2) the x-rays in question were taken at the request of the physician treating Lucas; 3) based on the notations that appeared on the x-rays themselves, it was evident that they were taken of Lucas on July 3rd, 8th and 10th, 1975; and 4) although she had not taken the photographs nor had she been present at the time they were taken, she assumed that proper procedures of x-ray mechanics were followed. The witness further testified as to the various angles and distances from which the x-ray photographs of Lucas were taken based on her actual inspection of the photographs and her knowledge of standard x-ray procedures.

Appellant Torres objected to the admission of the x-ray photographs on the ground that the state had failed to lay a sufficient factual foundation. In particular, the appellant argued that the x-rays could not be properly authenticated

without calling the technician who took them to testify as to the subject depicted therein and the manner in which they were taken. Over this objection, the x-rays were admitted into evidence.

The prosecution's next witness was a doctor specializing in forensic pathology. After testifying as to his expertise in matters pertaining to the removal of bullets from bodies and the calibers of various bullets, and as to his familiarity with x-rays, x-ray photography and the identification of bullets as shown on x-ray photographs, the witness was allowed to conclude that the object appearing on the x-rays taken of Lucas was "most likely" a .22 caliber bullet.[1] Thereafter,

---

[1] Before concluding that the bullet-like object appearing on the x-ray photographs of Lucas was probably a .22 caliber bullet, the forensic pathologist explained his methodology in the following manner:

Prosecutor: Doctor, would you relate how you — what procedure you followed and what you determined, please?

Witness: I examined the x-rays and was able to locate the — a metallic object of the shape and form of a bullet in at least four of the x-rays. I measured the diameter of the shadow and the measurements varied in different views because they were taken at different distances from the x-ray. The measurements were 6 millimeters, two of them were 6.5 millimeters and one was 7 millimeters. The most commonly-used calibre guns are .22, .25, .35, and .45. The shadow on the x-ray had to be larger than the bullet itself because of the cone effect, the x-ray source being almost a point, and the further away you get from the point the wider is the — the angle remains the same but the spread of the cone enlarges, so that taking a photograph, or a photograph of a metallic object, will produce a picture on the film that is slightly larger than the object itself.

So, that by these measurements and knowing the measurements of these various calibre bullets, I concluded that the bullets in these x-rays was a .22 or a .25 calibre bullet, most likely a .22 calibre bullet. The diameter of a .22 calibre is 5 millimeters. That of a .25 calibre bullet is 6 millimeters. And since one of the measurements, at least, showed that the diameter was 6 millimeters, is the reason I say it was most likely a .22 calibre bullet.

\*    \*    \*    \*

Prosecutor: What you are pointing out, then, is if the object which you pointed out as the bullet is going to appear on the x-ray, is always somewhat larger?

Witness: Yes, that is correct.

Prosecutor: On the x-rays which you studied, what were the dimensions?

Witness: The dimensions of the diameter varied from 6 to 7 millimeters. I took four measurements; one was 6, two were 6½, one was 7.

Prosecutor: And you say they varied because the x-rays — each one — those were taken from different distances?

Witness: Yes, that is correct.

appellant unsuccessfully moved to have this testimony stricken.

On January 24, 1976, the jury found appellant Torres guilty of attempted murder and, subsequently, she was sentenced to imprisonment for a term of twenty years.[2] This instant appeal followed.

Appellant urges this court to reverse her conviction on the grounds that (1) the x-ray photographs purporting to show an object lodged in Lucas' body were erroneously admitted by the trial court and (2) it was improper for the trial court to allow the forensic pathologist to give his expert opinion as to the caliber of the bullet-like object appearing on said x-ray photographs.

## ADMISSIBILITY OF X-RAY PHOTOGRAPHS

It has been generally recognized that x-ray photographs, like ordinary photographs, are admissible in evidence when

---

Prosecutor: What did you state the diameter at the —
Witness: .22 calibre bullet is approximately 5 millimeters.
Prosecutor: Which is less than each of those?
Witness: Yes.
Prosecutor: And what did you say the diameter of a .25 is?
Witness: 6 millimeters.
Prosecutor: Which would not be less than the one 6 millimeter measurement?
Witness: That is correct.
Prosecutor: Now, what, Doctor, if you know, is the measurements of a .38 bullet?
Witness: 7 millimeters. I should emphasize here that these bullets were not measured with a micrometer to get these. They were measured with a millimeter scale.
Prosecutor: Well, how close can you come with a millimeter scale?
Witness: For all practical purposes, close enough.
Prosecutor: Well, what would be the maximum? What would be a probable variance then, Doctor?
Witness: Quarter of a millimeter.
Prosecutor: So, based upon this, what is your opinion as to what that bullet is?
Witness: Possibly a .25 calibre; more likely a .22 calibre.
Prosecutor: Is it possible anything larger than that?
Witness: No.

[2] The co-defendant in appellant's trial, Bonnie Lynn Horeses, was ultimately found guilty of manslaughter and sentenced to a ten-year term of imprisonment.

relevant and properly verified. 3 C. Scott, PHOTOGRAPHIC EVIDENCE § 1251 (2d ed. 1969). Whether or not an x-ray photograph has been sufficiently verified so as to warrant its admission in evidence is a matter within the sound discretion of the trial judge. *See, e.g., Sim v. Weeks*, 7 Cal. App. 2d 28, 45 P.2d 350, 356-57 (1935); *Kramer v. Henely*, 227 Iowa 504, 288 N.W. 610, 611 (1939); *Clark v. Reising*, 341 Mo. 382, 107 S.W.2d 33, 35 (1937).

Hospital records, including x-rays made and kept in the regular course of the hospital's business, have been found to be admissible into evidence as business records where qualified in accordance with the applicable business record statute. *See Rouse v. Fussell*, 106 Ga. App. 259, 126 S.E.2d 830 (1962); *Allen v. St. Louis Public Service Company*, 365 Mo. 677, 285 S.W.2d 663 (1956); *Dana v. Von Pichl*, 39 App. Div. 2d 744, 332 N.Y.S.2d 368 (1972). HRS § 622-5 (1976), the statute governing the use of business records as evidence, provides:

> A record of an act, condition, or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court or person having authority to hear, receive and examine evidence, the sources of information, method, and time of preparation were such as to justify its admission.

> The term "business" includes every kind of business, profession, occupation, calling, or operation of institutions, whether carried on for profit or not.

Here, we believe that the statutory requirements for admissibility were met. The testimony of the chief x-ray technician sufficiently established that the photographs were of Lucas and adequately described how they were taken. Moreover, it is evident that the x-rays in question were prepared in the ordinary course of the hospital's operations and near the time of the alleged shooting incident.

Under these circumstances, we see no reason to require, as appellant urges, that the prosecution call the x-ray techni-

cian who actually took the photographs to testify. To do so would seem to defeat the purpose of the business record statute.[3] *Allen v. St. Louis Public Service Company, supra.* Absent a *bona fide* dispute as to the authenticity of the x-rays involved herein, we fail to see how the trial court abused its discretion in admitting them into evidence.[4]

## EXPERT TESTIMONY

Appellant's second contention is that the trial court erred in allowing the forensic pathologist called by the prosecution to render an expert opinion as to the caliber of the bullet-like image appearing on the x-ray photos of Lucas. In particular, appellant asserts that the pathologist was not qualified to render such an opinion and that the method employed by the pathologist in formulating his opinion was "neither sufficiently perfected nor reliable enough to permit his testimony in evidence."

It has been held that, where prejudice is shown, it is reversible error to permit a witness to interpret an x-ray photograph without proof that he is qualified as an expert in the reading of x-ray films. *See People v. Williams*, 337 Ill. 371, 169 N.E. 190 (1929). However, the determination of whether or not a witness is qualified as an expert in a particular field is largely within the discretion of the trial judge and, as such, will not be upset absent a clear abuse of discretion. *State v.*

---

[3] HRS § 622-5 is a modified version of the Uniform Business Records as Evidence Act. One of the effects of this Act is to dispense with the common law requirement that one offering proof under the regularly kept records exception to the hearsay rule either call as witnesses all links in the organizational chain by which the record was made, or establish their unavailability. E. Cleary, et al., McCORMACK'S HANDBOOK OF THE LAW OF EVIDENCE 729 (2d ed. 1972).

[4] We may have reached a different result had the x-ray photographs in question been made during the course of preparing for trial or with an eye toward litigation rather than for purposes of treatment. Palmer v. Hoffman, 318 U.S. 109 (1943).

Appellant further contends that the admission of the x-rays without the opportunity to cross-examine the technician who took them denied her of her constitutional right to confrontation. However, it has been held that the admission of a properly qualified hospital record does not violate the accused's right to confront the witnesses against him if the record meets the requirements of the applicable business record statute. *See* State v. Larkins, 518 S.W.2d 131, 136 (Mo. Ct. App. 1974).

*Murphy*, 59 Haw. 1, 14, 575 P.2d 448, 457 (1978); *City and County of Honolulu v. Bonded Investment Co., Ltd.*, 54 Haw. 385, 390-91, 507 P.2d 1084, 1089 (1973); *Bulatao v. Kauai Motors, Ltd.*, 49 Haw. 1, 13, 406 P.2d 887, 893-94 (1965).

Upon a showing of sufficient training and experience in the interpretation of x-ray photographs, one may testify as to what is shown on x-ray photographs in evidence. Furthermore, even though a witness does not qualify as an expert in the interpretation of x-rays, he may still testify, in some cases, as to what they show so long as his testimony is limited to his particular field of knowledge. 3 C. Scott, PHOTO-GRAPHIC EVIDENCE § 1270 (2d ed. 1969).

In the case at bar, the pathologist gave ample testimony as to his training and experience in the areas of x-ray photography and ballistics.[5] Hence, we believe that the trial judge rightfully found that his opinion as to the caliber of what appeared to be a bullet lodged in Lucas' abdomen was within the scope of his expertise. Once qualified to testify, the

---

[5] After testifying as to his background in forensic pathology, the witness testified as follows:

Prosecutor: Now, doctor, you have had experience then with bullet wounds?
Witness: Yes.
Prosecutor: Let me ask, I take it you have had experience also with removing bullets from bodies?
Witness: Yes.
Prosecutor: And I ask approximately how many times you have done that?
Witness: It would be in the range of hundreds, somewhere up to a thousand. I don't think I have done over a thousand but I have done hundreds of them.
Prosecutor: Is part of your job to try to estimate the size of bullets?
Witness: Yes.

\*   \*   \*   \*

Witness: I am familiar with calibres of various bullets. I have extracted bullets of various calibres from decedents. I have handled the live ammunition. Is there anything further that I can give you?
Prosecutor: Well, with regard to making this particular determination which you have indicated you made a determination as to — from an x-ray as to the size of the bullet, now, if you — of course, I don't really know what procedure you followed, but what I am wondering, what qualifies you for the procedure you followed?
Witness: I am familiar with the nature of x-rays, x-ray machines, x-ray film, the distances at which films are taken, and I am also familiar with the outline of bullets as shown on x-rays as well as bones for comparison of size, and what I did in this case was to measure the shadows.

pathologist's knowledge of the subject matter would go to the weight rather than the admissibility of his testimony. *Territory v. Adelmeyer*, 45 Haw. 144, 148, 363 P.2d 979, 983 (1961).

With respect to the method employed by the pathologist in interpreting the x-ray photographs, we think that the state of the art in the field of x-ray photography is sufficiently advanced to allow this type of evidence in the trial of a case. In reaching this conclusion, we are mindful of the fact that courts in other jurisdictions have allowed into evidence expert testimony as to whether an object shown in an x-ray photograph is of a bullet of a certain caliber. *See, e.g., State v. Nix*, 327 So.2d 301, 342 (La. 1975), *cert. denied*, 425 U.S. 954 (1976); *Mautino v. Piercedale Supply Co.*, 338 Pa. 435, 13 A.2d 51 (1940).

Affirmed.

*Ronald M. Yonemoto*, Deputy Public Defender *(Donald K. Tsukiyama*, Public Defender) for Defendant-Appellant TORRES.

*Ralph R. LaFountaine*, Deputy Prosecuting Attorney *(Togo Nakagawa*, Prosecuting Attorney) for Plaintiff-Appellee.